

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-16-922

| | |
|---|---|
| HONGYANG "BRIAN" LI<br><div align="right">APPELLANT</div><br>V.<br><br>YI DING<br><div align="right">APPELLEE</div> | **Opinion Delivered:** April 19, 2017<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72DR-10-809]<br><br>HONORABLE BETH BRYAN, JUDGE<br><br>REVERSED AND REMANDED |

**WAYMOND M. BROWN, Judge**

This is an appeal from the circuit court's order granting appellant's petition to modify custody, in which it awarded joint custody to both parties.[1] On appeal, appellant argues that the circuit court erred (1) in determining that joint custody is in the best interest of the parties' minor children, (2) in denying appellant primary custody of the parties' minor children, and (3) in the amount of child support it ordered appellant to pay. We reverse and remand.

A divorce decree was entered on June 18, 2010, awarding primary custody of the parties' two minor children—G.L. and N.L.—to appellee and ordering appellant to pay $1,176.00 in child support, among other things. On December 16, 2015, appellant filed a

---

[1]Appellee moved for late filing of brief on April 14, 2017. The motion was granted.

motion to modify custody alleging an unidentified material change in circumstances.[2] On January 15, 2016, appellee filed a motion to dismiss appellant's petition for failure to include facts supporting the petition as required by Arkansas Rule of Civil Procedure 7.[3] A hearing on appellant's petition was held on July 1, 2016.

Appellant testified, in pertinent part, to the following. Both parties agreed to enter G.L. into the lottery to get into Haas Hall Academy (HHA)—where 100% of the students go to college—when G.L. was going to the seventh grade, but appellee failed to "follow through" on doing so.[4] Appellant followed up with appellee to ensure that G.L. was getting enrolled, but it was clear that appellee had not signed up G.L. Appellant registered G.L. through the school's lottery system for her ninth-grade year, but she did not get in. Appellant stated that appellee was not active in the children's school engagements. One example given was appellee's failure to attend a ceremony in which G.L. was recognized for receiving the highest SAT score in Arkansas, despite a free bus ride being provided to the event. She was either late or missed other meetings dealing with the children's education. Appellee also does not go to N.L.'s baseball practices or games. He also discussed the difficulties imposed on the children's education by appellee's failure to acquire internet service, despite his offer

---

[2]Appellant's counsel would later state at the hearing on the matter that he makes his pleadings very generic because they are public.

[3]However, she effectively agreed to withdraw her motion at the hearing on the petition when she agreed to proceed for "judicial efficiency."

[4]HHA enrolls grades seven through twelve. N.L. had been admitted to HHA after appellee agreed to let appellant sign him up.

to pay for the same. G.L.'s application to Duke University's TIP program was late, so she had to be waitlisted, though she did eventually get in.

Appellant also noted that while both children had eye exams back on April 4, 2016, to date, appellee still had not gotten their glasses. N.L. was supposed to be doing a treatment for his eyes at home, but appellee was failing to ensure that he did so. In an "outburst" over the phone, appellee told appellant, "if you want to give him this treatment, you help him." Furthermore, appellee was hindering his visitation, recently disallowing N.L. to go on a visit with appellant until he had completed his chores, which appellant helped him finish. He told the circuit court about a call he received from the Department of Human Services (DHS) about appellee "slapping [N.L.] on the face." Appellee, who was unemployed, had lived in five or six places since their divorce, including with a man who was arrested for video voyeurism.[5] Appellee is now taking medication for her mental-health issues, though she did not when the parties were married. Appellant was seeking primary custody because he is "the one doing all the things for schooling, education, activities, and medical stuff for the children now[,]" which he has been "doing for a long time[,]" and "[i]t's difficult to do that as a non-custodial parent because the children are at the other home." He was opposed to joint custody because

> Everybody gets different ideas. I won't do this. I won't do that. So, what are we going to do the next time? The reason why is we got different ideas. [Appellee] got her own ideas how to take care of the kids. I've got my own idea of how to take care of the kids.

---

[5]Appellant did not learn of this event until "almost six months after" when the man was already in jail. She testified that she "didn't know [she] or the children were victims of voyeurism or anything."

SLIP OPINION

Appellee testified that appellant had "expressed concern to [her] about wanting to get custody of the children . . . a few times when [she] didn't go [his] way regarding parenting." She was not working; her income was her scholarship, a Pell grant, and child support. She explained her multiple housing situations, noting that two were due to mold issues. She explained that the wife of the perpetrator of the video voyeurism was someone she knew from church, and the perpetrator was the mold inspector she had hired to inspect the mold in two or three places she had lived. She stated that she was "deeply involved" in volunteering with Leverett Elementary during the 2013–2014 school year, so much that she received volunteer of the year for Fayetteville schools that same school year. She used the time during N.L.'s games to take G.L. to use the internet at a church on-campus ministry, RFC.

Appellee averred that she had taken the kids to "all of the doctors' appointments except some eye doctor's [sic] appointment that [appellant] wanted to take"; she was never late and never missed a treatment. The children's new glasses had been ready since "the end of May, beginning of June," but the children had been on a mission trip and a trip with appellant. She did not remember appellant offering to pay for internet service at her home— "[m]aybe that's true"—but she was "not opposing it." She emails the children's teachers at the start of the school year and requests that they provide the children with hard copies of work assigned online. Teachers have been accommodating, with each responding to her emails that they do not require internet, will not assign internet homework, and will provide hard copies if they do assign internet homework. She takes the children to RFC to use the

internet and does not have internet in her home because she thinks it is "[n]ot only the best environment, also, in our priority" not to have internet in the home.

Appellee admitted being investigated by DHS for slapping N.L. in April 2014. N.L. was "grumpy" and a "slow person" that morning, but she "did wrong by slapping him because [she] wanted to get him to school on time." She averred that it was an isolated event. Regarding HHA, she denied that she agreed to register G.L. there for her ninth-grade year, though she did permit appellant to register her there. She admitted that she "failed to follow through with the online registration" last year. She stated that appellant "did tell her to sign" G.L. up there, but went on to state that their "pattern of communication" was that appellant "gives orders, [she] takes orders." She was "co-dependent and he [controlled] everything" in their marriage. She explained that she thinks G.L. has "the hurdle of being comfortable, stand out and being a leader" and she thinks "public school would actually offer her more opportunity to try different things" where HHA is "very focused on academia," in which G.L. is already "no doubt" capable. As far as the late Duke TIP program application goes, appellant "never discussed [the program] with [her] in the firsthand"; he just gave her a form and she filled out her part and returned it to him.

Appellee's concerns with the children being in appellant's custody were that appellant "does not allow [his wife] to be the authority of the household" with the kids "simply completely ignor[ing]" her instructions, appellant's drinking, and appellant's anger with her when she does not "go his way." She was not fighting appellant in this case; she was "fighting this dysfunction of this family" because she did not "want the kids to be involved

in this dysfunctional family relationship with controlling father, with co-dependent mother." However, though she admitted that it was "hard" for her to "stand up and say no" or that she did not agree with appellant, she thought joint custody was best for the children. She admitted being overwhelmed by her commitments "[b]ack in 2014" with her condition "interfer[ing] with her ability to focus on her children's needs." She limits her commitments to avoid being overwhelmed by them and is being treated with counseling and medication for anxiety and depression since the divorce. She has a "habit of getting [N.L. to school] late" because she is "overwhelmed in the morning trying to get everything together." Both parents testified to there being tension between the kids and the other parent; however, appellee also admitted to there being tension between herself and the children.[6]

The circuit court ruled from the bench granting joint custody to the parties. It found that there had been a material change in circumstances on account of the parties' "obviously significant disagreement on where the children should attend school." It found that "an agreement was reached" to apply to and/or register for HHA for G.L. on two occasions, but "[appellee] did not take the necessary steps as the primary custodian to effectuate that agreement as to the children's education." It found that there was "uncontroverted testimony that while there were certain mental health issues during the marriage, that they have become so severe that her depression and anxiety require counseling and medication

---

[6]Following appellee's testimony, both parties left the courtroom so that G.L. could testify. G.L., who was thirteen at the time of the hearing, only testified to the accuracy of a letter she wrote to the judge stating her wish to live with her dad and the reasons why. The letter was admitted into evidence.

and that she at times is overwhelmed and that has affected her ability to be the primary custodian." It also highlighted the instability of her six moves and the tension between appellee and N.L., which led to a DHS investigation due to her slapping N.L.[7]

It found that the material changes in circumstances "obviously" adversely affected the children where there was uncontroverted evidence of appellee slapping N.L., "missed opportunities for schooling that the court finds both parties agreed to," and no follow-up on doctors' appointments. It also found that the material changes in circumstances "is a result of [appellee] essentially being overwhelmed because of the burdens of being a single mother with primary custody and also suffering from the depression and anxiety." The circuit court went on to find the following:

> The court finds that obviously the parties' parenting skills are very different. I don't know that I've seen two more diverse personalities than the two of you. Both of you are abusing your children in very different ways and that has caused, the court finds, problems for the children.
>
> However, the court finds that both of you have character traits, personality traits that are beneficial to the children and that they would benefit by having more time with each of you. And while communication between the two of you has been poor, again, because of these very different personalities—[appellee] describes it as sort of a co-dependent relationship. That [appellant] makes the decisions and she just sort of—has always had to acquiesce, which that's a problem and that's not good communication. But the court finds that even though communication has been poor, I believe that the children's best interests requires that they receive equal time with each of you.
> . . . .
>
> [E]ven though I find that you two do not communicate very well, I find that it would be in the bests interests that each of you share joint custody of the minor children and that there be equal time with the children.
> . . . .

---

[7]N.L. also likes to "bang on something" when he gets stressed and apparently hit a wall recently.

[T]he ultimate goal is that if you look at a 30-day calendar, each of the parents have the children equal time. So, about 15 days. This is obviously going to require that you all learn how to communicate. You're completely failing at communication as is and your children are picking up on that.

. . . .

It's important that you all be on the same page and not let them kind of work each of your against the other one in order to get what they want. So, it will be important to have—obviously, your parenting skills are different, the no Internet, not many electronics [at mom's house], that sort of thing, much more electronics and Internet access at dad's house.

The circuit court then ordered parenting classes. It went on to state:

I will say that I've never ordered joint custody in a case, ever—or the parties don't agree to it. So, I'm taking a chance on you all, and I just believe that this is a very unique case because each of you have such positive attributes that are just so different from the other. I really believe that your children will benefit from spending an equal amount of time with both of you.

You both are very rigid, it appears, in your thinking and I think it might help. And, hopefully, one of these classes will teach you how to be a little bit more flexible because I think flexibility is probably the key when you're dealing with teenagers and you're dealing with an ex-spouse.

Then, noting that no affidavits of financial means were submitted to it, though required, the circuit court stated that "there's obviously a discrepancy in income." So, it ordered a determination of the amount of child support appellee would be required to pay if she was making minimum wage and a determination of what appellant would be required to pay based on his current income, and then ordered that appellant be required to pay child support in the amount of the difference. An order consistent with the circuit court's oral ruling was entered on July 18, 2016, with the exception that though the circuit court orally ordered appellant to pay a "much reduced amount" of child support based on the above-

referenced calculation, the order increased appellant's child support obligation to $1,259.00 from $1,176.00. This timely appeal followed.

We have recited the standard of review in child-custody cases:

> Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. A judicial award of custody will not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree will be in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the circuit court or were not known by the circuit court at the time the original custody order was entered. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. The reasons for requiring these more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues. The party seeking modification has the burden of showing a material change in circumstances.[8]

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence.[9] We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses.[10] This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the

---

[8] *Erskin v. Stout*, 2015 Ark. App. 533, at 6, 472 S.W.3d 159, 163 (citing *Harris v. Harris*, 2010 Ark. App. 160, at 13–14, 379 S.W.3d 8, 15–16 (citing *Hatfield v. Miller*, 2009 Ark. App. 832, at 7, 373 S.W.3d at 366, 371)).

[9] *Geren Williams v. Geren*, 2015 Ark. App. 197, at 9, 458 S.W.3d 759, 766 (citing *Lowder v. Gregory*, 2014 Ark. App. 704, at 14, 451 S.W.3d 220, 229).

[10] *Id.* at 9–10, 458 S.W.3d at 766.

fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[11]

## I. *Joint Custody vs. Primary Custody*

This court will necessarily address appellant's first and second arguments together. Appellant argues that an award of joint custody was erroneous because the parties have "difficulties" that are "longstanding" with communication and cooperation, specifically noting that appellee "frequently fails" to cooperate with appellant for the children's educational benefit, including her refusal to obtain internet access for her home. Accordingly, appellant argues that the circuit court erred in failing to award him primary custody. While we remand for a determination on primary custody, we agree that an award joint custody was improper.

Arkansas Code Annotated section 9-13-101 states that an award of joint custody is favored in Arkansas.[12] As used in this section, "joint custody" means the approximate and reasonable equal division of time with the child by both parents individually as agreed to by the parents or as ordered by the court.[13] Regardless of whether joint custody is favored, our law remains that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award

---

[11]*Id*. at 10, 458 S.W.3d at 766.

[12]Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Repl. 2015).

[13]Ark. Code Ann. § 9-13-101(a)(5).

of joint custody, and such an award is reversible error when cooperation between the parties is lacking.[14]

The circuit court's order found a material change in circumstances based on the facts that

a) the parties reached agreements regarding the education of the children, but Mother did not take the steps necessary to follow through on those decisions; b) Mother's mental health condition has worsened to the point that her depression and anxiety overwhelm her at times; c) Mother has had unstable housing; and d) the tensions between Mother and the children have been significant enough to warrant the involvement of [DHS].

Its order specifically found that the children were adversely affected by "DHS involvement, loss of educational opportunities[,] loss of housing[,] and delay in medical treatment." In their testimony, the parties voiced their disagreement about the educational needs of the children with both having different opinions on the importance of academics versus being well-rounded people. The parties voiced different opinions on the medical needs of the children with appellee seeing no need for treatment beyond what N.L.'s optometrist prescribed, since he had not recommended further treatment or seeing a specialist, and appellant took N.L. to a specialist and began a treatment without telling appellee.[15] Appellee testified that appellant was controlling during their marriage and ordered her to do things throughout the parties relationship, pre- and post-divorce, to which she found it hard to say no, even when she did not agree. Appellant testified that he and appellee had "different

---

[14]*Hoover v. Hoover*, 2016 Ark. App. 322, at 7, 498 S.W.3d 297, 301 (quoting *Stibich v. Stibich*, 2016 Ark. App. 251, 491 S.W.3d 475).

[15]It appears that appellant told appellee that he set an appointment for N.L. regarding his eyes, but did not tell her that the appointment was with a specialist until after the appointment.

ideas" for how to raise the kids. Appellee admitted that she could become "overwhelmed" by her commitments and described the family as "dysfunctional." Appellant sought primary custody though appellee sought joint custody.

Based on the testimony of the parties, the circuit court found that there was "obviously significant disagreement" regarding school choice and that the parties' parenting skills were "obviously" different. It found that communication between the parties was "poor" and found that both parties were "very rigid" in their thinking. It agreed that appellant made decisions and appellee "has always had to acquiesce," which it found to be a "problem" and "not good communication." Despite these findings, the circuit court decided to "[take] a chance" on the parties and award joint custody, being "hopeful" that the arrangement would work. The parties were married on August 8, 1997, and lived together for thirteen years until April 21, 2010, when they separated, and so the descriptions by the parties and the court of the parties' communication has been true for years. However, the circuit court ordered the parties to take four, one-day parenting classes to help with the chance it was taking, to "hopefully" help their communication to one another, which the circuit court described as "completely failing."

The circuit court's oral findings on the cooperation in the relationship of the parties contradict its oral and written finding that joint custody was in the children's best interest where the former detail how cooperation between the parties is utterly lacking. As stated in the factually similar case *Stibich*, "it is contrary to the best interest of the children to award joint custody to parents who cannot cooperate—particularly when cooperation is lacking

on matters pertaining to the care and upbringing of the children."[16] This court holds that the circuit court's finding that joint custody was in the children's best interest was clearly erroneous. We reverse and remand this matter to the circuit court for proceedings consistent with this opinion. Because we reverse the custody award, appellant's child support argument is moot.

Reversed and remanded.

KLAPPENBACH and WHITEAKER, JJ., agree.

*Taylor Law Partners, LLP*, by: *William B. Putman*, for appellant.

*Goodrum Law Firm, PLLC*, by: *Sara E. Goodrum*, for appellee.

---

[16] *Stibich*, 2016 Ark. App. 251, at 6, 491 S.W.3d at 479 (this court reversed the circuit court's award of joint custody where it found that the parties had an "unwillingness to agree on anything" and fought about "even the most insignificant matters").