BART F. VIRDEN, Judge
Victor B. Williams, M.D., appeals the order of the Pulaski County Circuit Court regarding his child support and visitation dispute with Tiffany Lofton. Williams presents five points on appeal: (1) the circuit court erred by not finding that a material change in circumstances occurred; (2) the circuit court erred in finding him in contempt of court for failing to provide medical insurance for their daughter[1] and in awarding Lofton resulting health insurance costs she incurred; (3) the circuit court erred in awarding attorney's fees; (4) the circuit court erred in its determination regarding visitation; and (5) the circuit court erred in denying Williams's request to allow money placed into an educational trust to be counted in lieu of a portion of his child-support obligation. We reverse and remand the first point on appeal for the circuit court to enter an order in compliance with Administrative Order No. 10, and because the circuit court's determination of attorney's fees may be affected by its decision regarding child support, we remand that issue as well. We affirm the circuit court's determination that Williams was in contempt of court for disregarding the court's previous order to provide VW's health insurance, and we affirm the court's award of related costs. We affirm the circuit court's decision regarding visitation, and we affirm its denial of Williams's request to contribute to VW's educational trust fund in lieu of a portion of his child-support obligation.
I. Relevant Facts
In October 2006, the Pulaski County Circuit Court entered an order adjudicating Williams as the father of VW. Williams was awarded visitation four hours every other Sunday, and he was ordered to pay $2,400 in child support each month. The circuit court directed Williams to maintain a $500,000 life insurance policy on VW naming VW as the beneficiary, to maintain health insurance for VW, and to pay all healthcare and dental costs not covered by insurance.
On May 23, 2014, Williams filed an amended petition to modify support based on his assertion that his income had decreased by more than 20 percent due to the loss of his medical license and his resulting unemployment. It was also that *875 month that Williams began paying $500 a month for child support instead of the court ordered $2,400 per month. Lofton filed a timely response; however, no action was taken by the court until two years later. On June 7, 2016, Lofton filed a motion to show cause requesting that Williams be held in contempt of court for unilaterally reducing his child support payment to $500 a month since May 2014, for failing to maintain life insurance, and for failing to maintain health and dental insurance for VW from January 1, 2012 to August 15, 2015. On July 5, 2016, Williams filed a second amended petition to modify child support reiterating that a material change of circumstances occurred due to the loss of his medical license in 2014, which led to the reduction in his income. Williams contended that he had been able to pay only $500 a month in support since May 2014. Williams described "ongoing issues" regarding the conditional reinstatement of his license and the difficulty of being admitted into the insurance networks due to his licensure issues. Williams requested that he be relieved of his obligation to maintain a life insurance policy. Williams disputed that he had not provided health insurance for VW.
On December 12, 2016, a hearing was held. At the hearing, Williams acknowledged that in 2006 he was ordered to pay $2,400 a month in child support, and he testified that he did so until May 2014, when he reduced his monthly payment to $500. Williams contended that his decision to reduce his child support payment was based on the loss of his medical license in April 2014 and the resulting reduction in his income. Williams offered testimony regarding the events that led to the loss of his medical license, namely that a peer review led to four complaints against him. Williams stated that his attorney failed to inform him of a related hearing before the medical board, and when he missed the hearing, his license was revoked from April 2014 to November 2015. In October 2015, Williams and the medical board reached an agreement that was entered in the circuit court in which his license was reinstated, but also setting forth that Williams was required to have a proctor oversee his work. Williams testified that since his reinstatement he had encountered difficulty finding insurance networks willing to enroll him, which has negatively affected his income because he is an out-of-network provider and patients pay more for his services. Williams also asserted that he did not agree to having a proctor oversee his work and that he disputed that aspect of the agreed order. Williams stated that he did not use a proctor and that one was not required by his current employer, North Metro Medical Center, where he works as an on-call surgeon.
Williams offered testimony regarding his income and his debt obligations. He stated that since April 2014, he had borrowed money from friends, withdrawn money from his retirement accounts, and drawn on his savings. At the hearing, he presented his 2014 and 2015 income tax returns, and he stated that the 2014 return showed that he earned around $109,000 from wages, royalties, and rental payments. Williams stated that from 2006 to April 2014, his income was around $192,000 "for child support purposes." Williams testified that his 2015 income tax report showed that he lost $51,585 that year in income. Williams explained that during the time his license was revoked, he kept his business (Surgical Associates) open because he believed that his license would be quickly reinstated. Williams testified that he paid from $6,500 to $7,000 a month in rent, and that he did not own the building. Williams then clarified that V & W Properties owned the building, and he and one other person owned V & W Properties.
*876 He explained that he was not able to pay the full year of rent and taxes in 2015, which accounted for the $51,585 in loss of income for that year. Williams testified that his 2015 income tax report showed that he had drawn $174,750 from his IRA. Williams testified that in 2016 he withdrew $165,000 from his IRA, that his total income was $167,895, and that he paid $93,675 to Surgical Associates. Williams explained that as of September 2016, he had begun earning income again as an on-call surgeon.
On cross-examination, Williams testified that he had not missed any payments in service to any of his debts, though at times he made late payments. Williams explained that he had overpaid $2,500 on a credit card to make room on the card because it had been at its maximum. Williams addressed his monthly gambling losses averaging $500 to $600. Williams stated that he posted bets for a friend who was in poor health and that while he was posting for his friend, he posted bets for himself as well. Williams admitted that his bank records showed gambling expenses for several months after his friend died.
Williams requested that the court set aside a portion of the child support to go into an educational trust. Williams testified that he did not have any confidence Lofton would pay for VW's college education because he had paid over $260,000 in child support over twelve years, and she had not diverted a portion of those payments to a college fund. Williams stated that he had placed $3,000 in a college fund for VW.
Williams testified that he had maintained health insurance for VW, and he presented a letter from his insurance provider, QualChoice, showing that VW had been covered since January 1, 2013. Williams admitted he had not given the insurance card to Lofton. Williams clarified that he had maintained a life insurance policy for VW as he had been ordered to do and that the policy had never lapsed.
Williams expressed to the court his desire to have a close relationship with VW, and he requested standard visitation. He stated that VW had been to his house once in December, that he had not exercised visitation in November, and that he was not sure whether she had been to his home in October. He explained that Lofton and he communicated by text, though it was difficult at times, and that once there was a gap of five or six weeks when Lofton did not respond to his texts regarding visitation. Williams stated that he wanted to be apprised of VW's school work as well, and he admitted that he had not gone to have lunch with VW at her school since his period of unemployment began, though he had attended school programs. Williams testified that he had not attended any tennis tournaments since she had begun playing four years before, though he blamed this on not being told when the tournaments were being held. Williams admitted that he had previously stated that he would not take VW to her extracurricular activities if they occurred during his visitation because he wanted to spend time with her. He clarified that he had misunderstood the question and that he would take her to her activities in the future.
Lofton testified that VW had visitation with Williams about every six to eight weeks and that she had spent the night at his house twice since she was born. Lofton explained that VW is uncomfortable at her father's house, that she sees visitation as "punitive," and that Williams's sporadic visitation was disruptive. Lofton did not believe that Williams tried to make VW feel at home when she was there, and she stated that he did not take her to extracurricular activities if they took place during his visitation. Lofton agreed that she did not return his texts toward the end of her *877 high-risk pregnancy and after the birth of the twins, which involved several weeks in the NICU. She explained that she was not intentionally ignoring him. Lofton noted that during his time of unemployment, Williams did not go to VW's school to see her or attend tennis tournaments, and she explained that she had given the school Williams's email address and he should be receiving updates on school functions. Lofton requested that the court grant Williams visitation in a "step-wise" manner-as he exercised visitation consistently, he would be given more visitation.
Lofton testified that she incurred health insurance expenses for VW because in the summer or fall of 2011 Williams informed her that it was too expensive to carry VW, and he was dropping her from his insurance. Lofton stated that she never received an insurance card from Williams, that they never talked about the subject again, and she never sent him a bill for any medical expenses that VW incurred. She explained that she had spent around $5,000 in increased insurance costs since that time. Regarding life insurance, Lofton testified that she did not recall whether Williams was ordered to carry one or if she was the beneficiary of the policy.
The circuit court entered an order on September 1, 2017, in which it denied Williams's request for modification of child support, visitation, and insurance requirements. The circuit court found that Williams unilaterally decreased his child support payment from $2,400 per month, to $500 per month and found that it did not consider his explanation for this reduction-that his medical license had been suspended by the State Medical Board due to his failure to attend a hearing "and for other reasons not fully explained"-sufficient to justify his actions. The circuit court found that "Defendant never proved by a preponderance of the evidence that his loss of license was through no fault of his own." The circuit court found that Williams had been able to pay all his normal debt as well as gamble during this period of suspended license; thus, the court reasoned that Williams had been able to pay his child-support obligation during this time as well.
The circuit court found that Williams never suffered an economic loss due to the suspension of his license, and he reduced his child support because he did not want to exercise visitation with VW. The circuit court also found that Williams "demonstrated an ability to earn net income such that his child-support obligation is and should remain $2,400 per month. Defendant's loss of income, if any, is due to his own actions, inactions or for reasons that were never adequately explained to the court."
The circuit court determined that Williams was in contempt for failing to provide medical insurance for VW and for failing to pay child support in the amount ordered. The court ordered Williams to reimburse Lofton $5,764.88 for premiums she had paid since 2012 and it found that Williams owed Lofton $70,300 in child support. The circuit court rejected Williams's suggestion that the circuit court allow him to offset the amount of child support he owed by the amount he placed in an educational trust and paid toward a life insurance policy. The circuit court also modified visitation, though it did not grant Williams's request for standard visitation to begin immediately. Instead, the circuit court ordered that Williams have visitation with VW for four hours every first and third Sunday for four months, and if he exercised visitation regularly during that time, the court ordered that visitation would be expanded to every first and third Saturday beginning at 6:00 p.m. and ending on Sunday at 6:00 p.m. The circuit *878 court found that visitation would be expanded to standard visitation if Williams complied with the order. Williams was also ordered to observe VW's activity schedule. The circuit court ordered that Williams's two weeks of summer visitation would begin in 2018, and he was ordered to communicate with Lofton about the desired two-week period by April 15. Lofton was allowed to maintain "holiday traditions," but the circuit court ordered her to make VW available for a portion of the holidays as she had done in the past. Lofton was awarded $6,600 in attorney's fees. Williams filed a timely notice of appeal.
II. Issues on Appeal
A. Child-Support Obligation
Williams contends on appeal that the circuit court erred by not finding that he proved a material change in circumstances occurred. Specifically, he asserts that his testimony regarding the loss and reinstatement of his medical license and the tax returns he presented to the court conclusively show that he suffered a significant loss of income; thus, he contends that the circuit court erred in determining that a material change of circumstances did not occur. Williams also asserts that the circuit court's order does not comply with Administrative Order No. 10 because the circuit court failed to determine Williams's income, failed to refer to the amount of support required under the guidelines, and failed to recite whether the circuit court deviated from the Family Support Chart. We agree with Williams's assertion that the circuit court did not comply with the requirements of Administrative Order No. 10, and we also remand for the circuit court to make a clear finding of whether a material change of circumstances occurred.
The appellate courts review child-support cases de novo on the record. Chitwood v. Chitwood , 2014 Ark. 182, 433 S.W.3d 245. Under our standard of review, we do not reverse a finding of fact by the circuit court unless it is clearly erroneous. Id. We give due deference to the court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony; however, we give no deference to a circuit court's conclusion of law. Id.
We address Williams's two issues related to child support in reverse order. In Kirby v. Semeyn , 2017 Ark. App. 556, at 8-9, 531 S.W.3d 462, 468, our court recently held that "Administrative Order No. 10 requires child-support orders to contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the chart." In the instant case, the circuit court stated that
[d]efendant has demonstrated an ability to earn net income such that his child support-obligation is and should remain $2400 per month. Defendant's loss of income, if any, is due to his own actions, inactions, or for other reasons that were never adequately explained to the court.
In neither the circuit court's original 2006 order nor in the 2017 order did it determine Williams's income, refer to the family-support-chart guidelines, or recite whether the amount of support deviated from the chart. The order is facially deficient for these reasons, and we reverse and remand for the circuit court to enter an order that complies with Administrative Order No. 10.
We now turn to Williams's assertion that the circuit court found that no material change in circumstances occurred. We disagree that the circuit court made a clear finding regarding whether a material change occurred, and we remand for the court to do so.
*879 A party seeking modification of a child-support obligation has the burden of showing a material change of circumstances sufficient to warrant the modification. Baber v. Baber , 2011 Ark. 40, 378 S.W.3d 699. Changed circumstances warranting an adjustment may include remarriage of the parties, a minor reaching majority, relocation, change in custody, debts of the parties, ability to meet current and future obligations, and change in the income and financial conditions of the parties. See Hall v. Hall , 2013 Ark. 330, 429 S.W.3d 219. Moreover, under Arkansas Code Annotated section 9-14-107(a)(1) (Repl. 2015), a relatively minor change in the payor's income can constitute a material change in circumstances. The statute sets forth that a change in gross income of the payor in an amount equal to or more than 20 percent or more than one hundred dollars per month shall constitute a material change of circumstances sufficient to petition the court for modification of child support according to the family support chart after appropriate deductions. Id. When a circuit court considers the issue of whether there has been a material change in circumstances, it considers the facts that have changed or were not known by the court at the time it entered the previous order. Troutman v. Troutman , 2017 Ark. 139, 516 S.W.3d 733.
As recited above, Williams offered testimony that included his description of his reduced ability to work since he lost his medical license, the effect of conditional reinstatement of his license, and his need to borrow money from friends and to draw money from his retirement fund. Williams also testified that during this time he had paid more than the minimum due for some debt, that he had been able to service all debts he had before the loss of his license, and he had gambling losses around $500 to $600 a month. Moreover, Lofton asserts in her brief that in a deposition, Williams admitted paying V & W Properties up to $15,000 a month for rent when the mortgage was only $6,900 a month. Williams also presented his tax returns for 2014, 2015, and 2016 showing his yearly income before and after he lost his license.
As we stated above, the circuit court found that he "never showed any economic loss as a result of his license suspension" and that "Defendant's loss of income, if any, is due to his own actions, inactions, or for other reasons that were never adequately explained to the court." It simply is not clear from the order whether the circuit court found that a material change in circumstances occurred. In Johnson v. Young , 2017 Ark. App. 132, 515 S.W.3d 159, a similar issue was presented for our review. In Johnson , appellant had filed a request in the circuit court to increase her ex-husband's child support payments based on a material change in circumstances. As in the instant case, there was extensive testimony and evidence presented regarding appellee's income. The circuit court denied her request for modification of support without making any findings or giving any explanation of its decision. Our court remanded the issue to the circuit court and held that it should have made a clear finding of whether a material change in circumstances occurred. Likewise, we remand to the circuit court for a determination of whether a material change of circumstances occurred.
As for the issue of attorney's fees, this issue must also be remanded to the circuit court because it is potentially related to the outcome of the child support issue. See Ark. Code Ann. § 9-14-233(b) ; Mills v. Mills , 2009 Ark. App. 175, 315 S.W.3d 707 (court must award attorney's fees at 10 percent of the judgment of arrears or any other reasonable amount).
*880 B. Contempt
Lofton asserted to the circuit court that Williams should be held in contempt of court for violating the terms of the 2006 paternity order, and the circuit court agreed with her, finding that Williams was in contempt for failing to provide medical insurance for VW. Williams argues that the circuit court erroneously held him in contempt for failing to pay health insurance premiums and by awarding Lofton the associated costs. His argument is not well-taken, and we affirm. The standard of review for a finding of civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. Burrow v. J.T. White Hardware & Lumber Co. , 2018 Ark. App. 212, 547 S.W.3d 500.
Our constitution and caselaw make it clear that the courts of this state have inherent power to punish a contemnor for contempt committed in the presence of the court or in disobedience of process. Ark. Const. art. 7, § 26. See Carle v. Burnett , 311 Ark. 477, 845 S.W.2d 7 (1993). This inherent power goes beyond the statutory authority provided by section 16-10-108. There is no question that willful disobedience of a valid order of a court is contemptuous behavior. Ark. Code Ann. § 16-10-108(a)(3) (Repl. 1999). Contempt may be established when the offending party willfully disobeyed a valid order of a court. Kilman v. Kennard , 2011 Ark. App. 454, at 7, 384 S.W.3d 647, 651-52. Before one can be held in contempt for violating the court's order, the order must be definite in its terms, clear as to what duties it imposes, and express in its commands. Id.
The 2006 order for support specifically sets forth that Williams is to maintain health insurance for VW and that Williams also agreed to be responsible for all medical costs not covered by insurance. Williams presented evidence that he maintained health insurance for VW. Indeed, a letter from QualChoice shows that he had carried insurance for VW since 2013; however, Lofton testified that in the summer of 2011 Williams told her that he was dropping VW's insurance because it was too expensive, which forced Lofton to add VW to her insurance at a cost of over $5,000 from January 2012 to the date of the hearing. Lofton explained that Williams refused her request to continue to carry VW's health insurance until the open enrollment period when she could add VW to her insurance for an additional $150 a month. She testified that Williams never provided her with an insurance card, and after the conversation in 2011, the subject was never discussed. Williams did not refute Lofton's statement that in 2011 he told her that he was not going to maintain insurance, and he agreed that he had not provided Lofton with an insurance card or paid any co-payments or any other medical costs since that time; thus, the circuit court did not err in holding Williams in contempt for violating the terms of the 2006 order to provide health insurance for VW or in ordering that Williams reimburse Lofton $5,764.88. On this point, we affirm.
C. Visitation
Williams contends that the circuit court erred in ordering visitation as it did. Essentially, Williams argues on appeal that his testimony that Lofton interfered with his relationship with VW should have been given more weight by the court. We disagree and affirm. In the 2006 order, the circuit court ordered that Williams's visitation with VW was to take place for four hours every other Sunday. The circuit court modified the original order of visitation and determined that Williams would have the same four-hour visitation with VW every first and third Sunday for four months; however, if Williams exercised visitation regularly during that time, visitation would be expanded to every first and *881 third Saturday beginning at 6:00 p.m. and ending at 6:00 p.m. Sunday. The circuit court ordered that if Williams continued to exercise visitation regularly, he would be given standard visitation including two weeks of summer visitation beginning in 2018.
This court has stated the best interest of the child is the polestar for making judicial determinations concerning custody and visitation. Buckley v. Buckley , 73 Ark. App. 410, 416, 43 S.W.3d 212, 216 (2001). A circuit court maintains continuing jurisdiction over visitation and may modify or vacate those orders at any time when it becomes aware of a change in circumstances or facts not known to it at the time of the initial order. Baber , 2011 Ark. 40, 378 S.W.3d 699. Fixing visitation rights is a matter that lies within the sound discretion of the circuit court. Id. When the best interests of the child are at stake, the circuit court should look into the particular circumstances of each case and act as the welfare of the child appears to require. Id. We know of no type of case wherein the personal observations of the court mean more than in a child-custody case. Wilson v. Wilson , 2016 Ark. App. 191, 487 S.W.3d 420.
The parties offered conflicting testimony regarding VW's visitation with Williams. Williams described a warm relationship with his daughter, centered on church, and he testified that they played basketball together. He testified that visitation was hampered by Lofton's refusal to respond to texts or to make him aware of VW's sports and school events. Lofton testified that Williams inconsistently exercised his visitation, that he did little to make VW feel comfortable at his home, and that VW had spent the night at Williams's house twice in twelve years. Lofton explained that Williams failed to take VW to extracurricular activities when she was with him and that he made no attempt to see VW on her birthday. We defer to the circuit court on credibility determinations, Ford v. Ford , 347 Ark. 485, 65 S.W.3d 432 (2002), and in light of our deference to the circuit court's ability to weigh the credibility of the witnesses, we hold that the circuit court did not err in its visitation determination. The circuit court thoughtfully addressed the visitation issue to fulfill VW's best interest and that also grants Williams the standard visitation he requested as he exercises his right consistently. We find no error in the circuit court's visitation order, and we affirm.
D. Educational Trust
Williams argues that the circuit court erred by denying his request to set up an educational trust in lieu of a portion of his child-support payments. We disagree and affirm.
Child support is not to provide for the accumulation of capital by children but is to provide for their reasonable needs. Smith v. Smith , 341 Ark. 590, 596, 19 S.W.3d 590, 594-95 (2000). Our supreme court has held that the statute and the guidelines do not support the argument that the circuit court has the authority to designate portions of the child-support award for an educational trust. Id. at 595, 19 S.W.3d 590 ; see McCrillis v. Hicks , 2017 Ark. App. 221, at 19, 518 S.W.3d 734, 746 (reversing the circuit court's decision to allow Hicks to pay into an educational trust in lieu of child support.) The circuit court correctly denied Williams's request to contribute to an educational trust in lieu of a portion of his child-support obligation.
Reversed in part; remanded in part; affirmed in part.
Abramson and Hixson, JJ., agree.

Williams and Lofton have one child together, VW, who was born November 17, 2004.