Cite as 2023 Ark. App. 363

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-22-328

| | |
|---|---|
| AMANDA HANSON (NOW JETTON)<br>APPELLANT<br><br>V.<br><br>ERNIE HANSON<br>APPELLEE | Opinion Delivered September 6, 2023<br><br>APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT<br>[NO. 14DR-10-102]<br><br>HONORABLE MARY THOMASON, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Amanda Jetton, formerly Hanson, appeals from a March 1, 2022 order of the Columbia County Circuit Court. She argues that the trial court committed reversible error by (1) placing Ernie Hanson in charge of medical decisions for the parties' children; (2) relying on personal information not in evidence; (3) basing the joint-custody decision on an unfounded belief that the family-in-need-of services (FINS) proceeding was a criminal proceeding against MC1, the oldest of the parties' children; and (4) ordering a change to joint custody of the parties' three children, MC1, MC2, and MC3. We affirm.

I. *Facts and Procedural History*

After seven years of marriage, during which three children were born, Amanda sought and obtained a divorce from Ernie. The divorce decree, to the extent relevant to this appeal, provides that Amanda would have custody of the children subject to reasonable and

seasonable visitation with Ernie. Ernie was ordered to pay child support that included a portion of his bonuses.

Amanda began having concerns that Ernie was not giving the children their prescribed attention-deficit-hyperactivity disorder (ADHD) medication during his visitation, as well as missing therapy sessions, so she filed a petition on July 22, 2020, asking the trial court to order him to do so; to award back child support; and to order Ernie to pay a portion of the cost of the children's medical insurance and out-of-pocket expenses. Amanda also requested that visitation be suspended until Ernie agreed to both give the prescribed ADHD medication and take the children to all therapy sessions and appointments during the times they would be with him.

Ernie filed a response on August 14 in which he asserted that medical providers had informed him that the prescribed ADHD medication was unnecessary on weekends and claimed that the children were in a "zombie-like" lethargic state when taking it. Ernie alleged that he had not been able to obtain the children's medical information from Amanda but that he had resumed giving the ADHD medication as prescribed on his weekends.

Several months later, on February 2, 2021, Ernie filed a motion for the appointment of an attorney ad litem and for a change of custody. He requested that an attorney ad litem investigate both homes and the needs and best interest of the children. Amanda responded on March 1, and on April 6, the trial court appointed Amy Freedman as attorney ad litem.

On December 28, 2021, Ms. Freedman issued her written report that includes the following:

## BACKGROUND:

This case presents as three children [(MC1 and twins MC2 and MC3)] from a divorced couple. The mother has remarried and has a younger child with the stepfather. The father of the children has not remarried but is in a committed relationship and plans to marry soon.

. . . .

The twins [MC2 and MC3] have consistently stated that they would like to have equal time with both parents. [MC1], the elder brother, has stated that he wants to live with his father, Ernie Hanson.

. . . .

## CONCERNS:

The parties distrust each other.

The parties are not co-parenting.

A FINS case was filed by the mother against [MC1], due to his "being habitually disobedient to . . . parents" and "being habitually physically rough and abusive to younger siblings." (See **EXHIBIT A** attached with FINS records.)

[MC2] has exhibited anxiety and is being treated for it in counseling.

[MC3] is not currently in counseling but may need it, as well.

Family counseling is needed.

Medication for ADHD is a major issue in this case. Dr. Cindy Porter was deposed and strongly recommends that the children stay on their meds and not have "drug holidays." The father, Ernie Hanson, has in the past, not given the meds when the children were in his care. . . .

. . . .

## RECOMMENDATIONS:

3

[MC1] shall be in the primary custody of his father, Ernie Hanson, and stay in the same school district and counseling. This recommendation is based primarily due to the stated FINS petition allegations (that [MC1] is "being habitually disobedient to . . . parents" and "being habitually physically rough and abusive to younger siblings.")The twins ([MC2 and MC3]) shall remain in the custody of their mother and have visitation with their father and older brother, [MC1]. All visitation between the twins and [MC1] should be supervised by a parent.

All children shall continue to take ADHD meds, including [MC1], without "drug holidays." Should [MC1] not take his meds for any reason other than as directed by a medical doctor, this would be ground[s] to return him to the custody of his mother.

Counseling for all children, as therapeutically recommended to continue.

Family counseling with both parents and stepparents as therapeutically recommended.

Ms. Freedman did modify her recommendation based on the testimony at the hearing, advocating that custody stay the same until everyone became seriously involved in counseling to learn how to coparent.

The parties, [MC1], and a couple of other persons testified at the final hearing held on February 17, 2022. Dr. Porter, pediatrician to all three children, testified by deposition. On February 24, the trial court issued a letter opinion, stating the following:

**Change in Circumstances**

. . . .

[Amanda's] filing of a FINS Petition clearly identifies her need for services due to the inability to deal with one of her children.

Also, the allegations of abuse that were reported to [Ernie] by the children are a change in circumstances. This would be a change in spite of the fact that Deputy Leroy Martin testified that when he questioned the daughter, she denied the abuse.

4

Deputy Martin stated that [Amanda] and step-father were aware he was going to question the daughter at the school prior to him doing so. The behavior of the stepfather towards the children and his scare tactics are a change of circumstances. [Amanda's] characterization of her husband as a big "teddy bear" was not borne out by the testimony.

**Custody**

It is in the best interest of the minor children that the parties be awarded joint custody of the three minor children with [Ernie] to make all medical decisions.

. . . .

[Amanda's] husband is not to discipline the minor children or be left alone with the children.

The "scare" tactic chosen by [Amanda] of using the juvenile authorities through a FINS Petition shall immediately stop.

. . . .

**Attorney Ad Litem**

. . . At the end of the hearing the Attorney Ad Litem changed her recommendation to leave custody as is subject to a review. The Court does not feel that to leave custody as it currently is would be in any way in the best interest of the children and only exposes the children to more stress and uncertainty.

The letter opinion from the trial court specifically stated that Amanda's testimony was not credible. It noted the trial court's observation of MC1 as he cried in the courtroom and explained that he would never hurt his siblings and referenced Amanda giving him a "stern" look as he testified. The trial court found that Amanda's new husband was disciplining the parties' children and was in control of them. The trial court further stated that it did not believe the parties would ever agree on medical decisions and that Ernie was

to be the one to make them and appears to have a more open mind and would look only to the children's best interest.

On March 1, the order establishing joint custody and visitation, which mirrored the previous letter opinion, was entered followed by a March 28 order modifying Ernie's child-support obligation, which included a provision requiring him to pay half of the children's monthly medical insurance premiums. Amanda timely filed her notice of appeal from both orders on March 29, but she has abandoned her appeal of the order modifying support because her brief did not address it.

## II. *Standard of Review*

In a recent case, *Kinder v. Kinder*, 2022 Ark. App. 476, at 4, 655 S.W.3d 880, 883–84, this court reiterated our standard of review in custody cases:

> In reviewing domestic-relations cases, appellate courts consider the evidence de novo. We will not reverse the trial court's findings unless they are clearly erroneous. A trial court's finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. In reviewing a trial court's findings, we defer to the trial court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony.

(Internal citations omitted.); *see also Ryan v. White*, 2015 Ark. App. 494, 471 S.W.3d 243. As was noted in *Pace v. Pace*, 2020 Ark. 108, at 9, 595 S.W.3d 347, 352, in matters involving custody, the best interest of the children is the paramount consideration.

## III. *Discussion*

### A. Placing Ernie in Charge of Children's Medical Decisions

On this issue, the trial court ruled in relevant part:

6

[Ernie] cannot stop any ADHD medication unless it is recommended by a medical doctor. If that occurs, he shall only discontinue the medication under the directions of the doctor.

. . . .

[Ernie] will make the medical decisions because the Court does not believe the parties will ever agree on medical decisions regarding the children. [Ernie] appears to have a more open mind and will look only to the children's best interest.

Amanda argues there is no basis for the trial court's findings, noting that he testified more than once that he did not believe the medical science that supports medication helping children with ADHD.

Ernie had never taken any of the children to the pediatrician until June 25, 2021. Evidence indicates that on that occasion, he insulted Dr. Porter and called her support of ADHD medication for the children "hogwash," at which point Dr. Porter ended the conversation with Ernie and was so upset that she left her office. Dr. Porter documented the confrontation in her records, which she read to the trial court.

Amanda submits that since the parties divorced, Ernie has been uncooperative about giving the children the prescribed ADHD medications, and Dr. Porter specifically did not support the "no-medication vacations" Ernie engaged in during his visitation with them. Despite Ernie's refusal to accept medical science, the trial court appointed him as the parent responsible for making medical decisions for the parties' children. Amanda submits that the trial court abused its discretion in so finding.

We disagree and hold that the record supports the trial court's finding that Ernie should be responsible for making the children's medical decisions. The testimony at the

hearing indicated that Amanda did not cooperate with him on such decisions, including failing to provide Ernie with copies of insurance cards so he could obtain treatment if needed during visitation.

At the hearing, evidence was presented to the trial court that Amanda had made significant decisions that negatively affected both the welfare of the children and Ernie's level of participation in their lives, including their medical care. Amanda acknowledged that she had not provided Ernie with information regarding the children's medical needs and conceded that Ernie was unaware of "most" of the expenses incurred. Although Amanda testified she wanted Ernie to have open access to the children's school and medical records, the trial court found, having considered all the evidence before it, that her testimony was not credible.

We defer to the trial court on credibility determinations and the weight to be accorded to witnesses' testimony, *see Williams v. Lofton*, 2018 Ark. App. 606, at 17, 569 S.W.3d 872, 881, and in light of our deference, we hold that the record supports the trial court's determination regarding the children's medical decisions. The trial court thoughtfully addressed the issue and included a specific provision in its order prohibiting Ernie from failing to give any ADHD medication unless it is recommended by a medical doctor and then only at the direction of the doctor. When weighed against Amanda's active hindrance to Ernie's ability to actively participate in these and other vital decisions related to the children's best interest, we hold that the trial court did not abuse its discretion and affirm this finding.

## B. Trial Court's Reliance on Advice from an Unnamed
## Counselor Regarding Stepparents Disciplining Stepchildren

Amanda next argues that the trial court relied on, and gave great weight to, evidence that neither side presented, basing part of its findings on evidence not in the record. This specifically relates to the trial court's ruling that Amanda's new husband, Greg, is neither to discipline the minor children nor to be left alone with them. Amanda submits that there was no evidence presented that Greg had hurt any of the children and that none of them are scared of him.

Amanda asserts that the trial court's decision was based entirely on what the trial judge's own counselor had told her at some point in the past when she was a stepparent. She maintains that a judge must not independently investigate the facts in a case and must consider only the evidence presented. *See* Ark. Code Jud. Conduct R. 2.9(C). It is undisputed that neither party presented the opinion of any expert expressing that stepparents should not take part in disciplinary matters within the household.

Citing *Hicks v. Cook*, 103 Ark. App. 207, 288 S.W.3d 244 (2008), Amanda points out that if a court takes judicial notice of any fact, it must be so notoriously true as not to be subject to reasonable dispute or must be capable of immediate accurate demonstration. *See also Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003) (reversing a custody award that was based on perceptions and appearances over proof of likely harm). There is a presumption that a trial court will consider only competent evidence, but this presumption is overcome when there is an indication that the trial court gave some consideration to inadmissible

evidence. *See Fields v. Fields*, 36 Ark. App. 179, 820 S.W.2d 467 (1991). Amanda urges that here, the trial court considered just such inadmissible evidence since the counselor whose opinion the trial court relied on did not testify, making his or her opinion purely hearsay.

Trials are to be decided only on the evidence and the testimony legally admitted during the course of the trial. *Harald v. Corwin*, 846 F.2d 1148 (8th Cir. 1998). Yet on this issue, the trial court announced, "A step-parent—I've been a step-parent of a teenager. But I wouldn't be disciplining him because counselors told me you don't, and I didn't."

Amanda urges that the trial court cannot shape its rulings by relying on out-of-court "expert" opinions from an unknown counselor with unknown qualifications. Accordingly, she maintains that the trial court's clear error supports the reversal of the entire decision.

We disagree. To the extent, if any, the trial court did factor in the above-described advice, the record before us supports that it was far from the only information considered on this issue. Amanda acknowledged at the hearing that Greg did not have a good relationship with MC1 in the past, but she noted that recently there had been improvement and credited the ill-reasoned FINS petition. It is significant that evidence before the trial court indicated that Greg had been directly involved in Amanda's decision to file the FINS petition. Likewise, there was evidence presented that Greg made "mean" faces to the children and that they feared him. Moreover, Deputy Martin testified that Greg was aware of Mr. Martin's intention to question one of the children while she was at school after Greg made a report about an incident that was later determined to be unfounded.

10

The totality of this evidence raised questions about Amanda's new husband's disciplinary practices, especially with respect to MC1. The trial court is in the best position to determine the weight and credibility of evidence before it, and in our de novo review, we cannot say that the trial court clearly erred in finding that Greg should neither discipline nor even be alone with the children.

### C. Did the Trial Court Base the Change of Custody on a Mistaken Belief That the FINS Proceeding Was a Criminal Proceeding Against MC1?

On this issue, the trial court ruled:

> The "scare" tactic chosen by [Amanda] of using the juvenile authorities through a FINS Petition shall immediately stop. [Amanda's] testimony was not credible. She advised that the counselor, Elana Murphy, recommended the FINS Petition. However, [Amanda] countered back later to say that Ms. Murphy did not tell her to do it and only recommended that she pursue the FINS Petition. The step-father, Greg Jetton, testified that he was hanging out at the Sheriff's Office and explained to them that the children were no longer scared of him when he would bow up at them using his size. According to Mr. Jetton, the Sheriff's deputies suggested that [Amanda] pursue a FINS Petition.
>
> The parties' oldest child, [MC1], is a good student and has no history of trouble at school.

Amanda testified that she relied on the advice of [MC1's] counselor and filed a FINS petition as to MC1. She likewise acknowledged that her husband was told by a sheriff's deputy that filing a FINS petition would be a good idea. Amanda also notes that while it is *now* true that [MC1] is a good student, he was not prior to the FINS proceeding, which Amanda submits "got his attention and straightened him up," both at school and at home. She argues that the change in [MC1's] behavior is *exactly* what a FINS proceeding is aimed at accomplishing and that she should not be penalized for filing it.

11

Amanda submits she was having serious disciplinary problems with MC1, including poor grades and misbehavior at school. She testified that he had (1) stuffed his younger siblings into a trash-collection bin and laughed about it and (2) drove a sibling to a convenience store on a four wheeler and left the child there. Amanda claimed he appeared to be trying to provoke his stepfather into striking him by being mean and hurtful to the younger children and doing everything he could to avoid taking his ADHD medicine.

Amanda testified that, on the advice of counselors, she filed a FINS petition to rein in MC1. She notes that, just as intended, his behavior at home and at school changed for the better. She claimed, and MC1 acknowledged, that by the time of the final hearing, MC1 was doing well in all respects. But rather than supporting Amanda's use of the state-sponsored FINS program, the trial court commented:

> This is—it's really bothersome, Mr. Crane [Amanda's attorney]. This is a punishment. She's using the system - - with serious consequences. She doesn't have any control over the consequences, so I want her to answer. . . . To punish a child. Used the legal system to punish a child. . . . Well, she testified—your client testified it was used as punishment. . . . That he's scared? What kind of psychological—I'll review all my notes and review the testimony.

Amanda argues that the trial court's misunderstanding of FINS proceedings as criminal proceedings led to clearly erroneous findings that punished Amanda for her successful use of a FINS proceeding to rectify MC1's behavioral issues. It is well-settled law that custody awards are not to be made to punish or reward either parent. *See Ingle v. Dacus*, 2020 Ark. App. 490, 611 S.W.3d 714. Amanda urges that the trial court clearly erred when

12

it punished her for seeking the benefits of the state-sponsored FINS program established to assist families solve such issues.

Our review of the record failed to indicate any finding by the trial court that it considered the FINS petition criminal in nature; rather, it specifically found Amanda not credible and reprimanded her for filing the FINS petition during the custody dispute and because she had "used the legal system to punish a child." Pursuant to the FINS proceeding, MC1 could be placed on supervision terms that had to be given to him in writing, *and* he could be placed in a detention facility if he violates a court order. *See* Ark. Code Ann. §§ 9-27-332(a)(4) & (6) (Repl. 2020), -336(a)(2) (Repl. 2020). MC1 was under weekly supervision by a probation officer, was subject to the possibility of juvenile detention, and had expressed fear about being placed in juvenile detention. But nothing in the record supports Amanda's allegation that the trial court misunderstood the FINS process or goal, and we see no basis for reversal.

## D. Ordering Joint Custody of the Parties' Three Children

Amanda initially states that the trial court's ultimate award of joint custody is directly counter to what the trial court told the parties at the end of the hearing, announcing from the bench: "From what I've heard and seen today, I don't ever see any 50/50 . . . ."[1] She also reiterates that the decision is directly contrary to the ad litem's recommendations, both before and after the hearing.

---

[1]The trial court's apparent change of heart is of no moment because the final written order controls over an oral ruling from the bench. *Cordell v. Hylle*, 2022 Ark. App. 209, at 8.

Amanda submits that the General Assembly initially expressed its concern about uncooperative parents when it changed the general preference to joint custody in part of Act 1156 of 2013, which provided that if "one parent demonstrates a pattern of willfully creating conflict to disrupt current joint custody, the court may deem such behavior as a material change of circumstances and may grant primary custody to the nondisruptive parent." Ark. Code Ann. § 9-13-101(b)(1)(A) (before its most recent amendment); *see also Hewett v. Hewett*, 2018 Ark. App. 235, at 6, 547 S.W.3d 138, 141 (reversal of joint custody based on parties' inability to cooperate and communicate).

Act 604 of the 2021 regular session of the Arkansas General Assembly, codified at Ark. Code Ann. § 9-13-101 (Supp. 2023), went into effect prior to entry of the final order in this case, and states in relevant part:

> SECTION 1. Ark. Code Ann. § 9-13-101(a)(1)(A), concerning the award of custody, is amended to add an additional subdivision to read as follows:
>
> . . . .
>
> (iv)*(b)* The presumption that joint custody is in the best interest of the child may be rebutted:
>
> *(1)* If the court finds by clear and convincing evidence that joint custody is not in the best interest of the child;
>
> . . . .
>
> SECTION 2. Ark. Code Ann. § 9-13-101(b)(1)(A)(ii) and (iii), concerning the award of custody, are amended to read as follows:
>
> (ii) To this effect, the circuit court shall consider awarding joint custody of a child to the parents in making an order for custody.

(iii) If, at any time, the circuit court finds by a preponderance of the evidence that one (1) parent demonstrates a pattern of willfully creating conflict in an attempt to disrupt a current or pending joint custody arrangement and the circuit court is unable to enter an order that will reduce areas of conflict caused by the disruptive parent, the circuit court may deem such behavior as a material change of circumstances and may change a joint custody order to an order of primary custody to the nondisruptive parent.

Section 9-13-101(b)(1)(A)(ii) does not make joint custody mandatory, it merely mandates that the trial court *consider* awarding joint custody. *See Wilhelm v. Wilhelm*, 2018 Ark. App. 47, 539 S.W.3d 619. Amanda argues that clear and convincing evidence indicates that the parties cannot cooperate when it comes to deciding the best interest of the children.

More stringent standards are required for modifications than for initial custody determinations to promote stability and continuity in the lives of the children and to discourage the repeated litigation of the same issues. *See Szwedo v. Cyrus*, 2020 Ark. App. 319, 602 S.W.3d 759. Here, neither party requested joint custody, nor did the ad litem.

While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the children. *See* Ark. Code Ann. § 9-13-101(a)(1)(A)(i); *Smith v. Hembree*, 2022 Ark. App. 121, at 8; *Bundy v. Womble*, 2018 Ark. App. 462, 558 S.W.3d 429.

Amanda cites *Li v. Ding*, 2017 Ark. App. 244, 519 S.W.3d 738, for the proposition that Arkansas law remains that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the children's welfare is a crucial factor bearing on the propriety of an award of joint custody. In *Li*, the trial court found that the parties had significant disagreement regarding school choice and parenting styles and were "completely

failing at communication." *Id.* at 8, 519 S.W.3d at 742. This court noted that the parents had separated six years before the hearing; thus, "the descriptions by the parties and the court of the parties' communication" showed that it had been consistently problematic for years. *Id.* at 12, 519 S.W.3d at 745. In *Hewett, supra,* the hearings were held approximately four years after the parents' separation, and the children were of school age. Amanda submits that if those periods of time are sufficient to show a "pattern" of whether parties are able to coparent, then the seven plus years here does as well.

This court recently noted that when parties have fallen into such discord that they are unable to cooperate in reaching shared decisions in matters affecting their children, then a material change in circumstances affecting the child's best interest has occurred. *See Beverly v. Murphy,* 2022 Ark. App. 4, at 5.

Amanda asserts that every witness who testified regarding the ability of the parties to coparent stated that they could not do so. She references the attorney ad litem's amended recommendation that joint custody should be off the table until after serious coparenting counseling. Even Ernie admitted the parties could not coparent and acknowledged that coparenting counseling might help things, despite his previous refusal to attend. Amanda submits that the evidence clearly established the parties have different rules and ideas on appropriate discipline for the children in their respective homes. She maintains that all of the evidence before the trial court clearly showed that the parties are incapable of effective coparenting and states that Ernie's complete refusal to coparent in any meaningful way should have resulted in a ruling to keep custody with her, not a change to joint custody.

We disagree and find merit in Ernie's argument that the trial court did not err in ordering joint custody. *See Grimsley v. Drewyor*, 2019 Ark. App. 218, at 8 (noting joint custody favored in Arkansas and that custody should favor "frequent and continuing contact of the child with both parents"). As the party petitioning for a change in custody, it was Ernie's burden to show a material change in circumstances, but in her brief, Amanda does not challenge the finding that there had been a material change in circumstances since the divorce—to the contrary, at trial, she acknowledged that her filing of a FINS petition against MC1 constituted a material change.

It is axiomatic that when there is a material change in circumstances, the trial court may modify custody, taking into consideration the best interest of the children, *see Taylor v. Taylor*, 353 Ark. 69, 77–78, 110 S.W.3d 731, 735–36 (2003), and it is undisputed that Amanda acknowledged before the trial court that her filing the FINS petition was a material change in circumstances during cross-examination.

Whether joint custody was in the children's best interest requires examination of a variety of factors. *See, e.g., Bamburg v. Bamburg*, 2014 Ark. App. 269, 435 S.W.3d 6. The record before us demonstrates that the trial court properly reviewed the evidence in light of those factors in its determination that a change to joint custody was in the best interest of the children. A polestar consideration in the determination of both custody or visitation is that the stability and protection in the lives of children is an issue of paramount importance. As noted in *Bamburg*:

17

With regard to custody and visitation, the primary consideration is the welfare and best interest of the children involved; all other considerations are secondary. . . The factors a trial court may consider in determining what is in the best interest of the children include the psychological relationship between the parents and children, the need for stability and continuity in the relationship between parents and children, the past conduct of the parents toward the children, and the reasonable preference of the child.

*Id.* at 8, 435 S.W.3d at 11–12 (citations omitted).

A parent's violation of court orders is yet another factor that can be considered by the trial court concerning child custody. *Stormes v. Gleghorn*, 2022 Ark. App. 416, at 14, 653 S.W.3d 820, 829. Amanda unilaterally decided when, and even whether, visitation would occur in violation of the decree. Examples included refusing visitation when the children were out of school for winter break because it was not a "holiday"; cutting off visitation completely when she learned Ernie had not been giving ADHD medication during weekend visitation; and refusing visitation because the children had been unmasked in an outdoor setting on vacation, despite no one being around them. This is significant because a parent's past action is a good indicator of future conduct, *see Collins v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 481, at 6, 655 S.W.3d 892, 896.

Finally, despite all of Amanda's arguments, the trial court's review of all the evidence led it to find her less than credible, as noted in the trial court's questioning about the FINS petition and her ultimate admission that it was to teach MC1 a lesson. A trial court weighs credibility, and if it is wanting, it cannot be overlooked. *Digby v. Digby*, 263 Ark. 813, 818, 567 S.W.2d 290, 293 (1978).

On the basis of our de novo review, we hold that the record supports the trial court's findings, and no clear error has been shown; accordingly, we affirm.

Affirmed.

BARRETT and HIXSON, JJ., agree.

*Crane, Phillips & Rainwater, PLLC*, by: *Steve R. Crain*, for appellant.

*Robert S. Tschiemer*, for appellee.