Robin Denise DANSBY *v.* Lathaire Wilfred DANSBY

CA 03-741 189 S.W.3d 473

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered June 30, 2004

[Rehearing denied August 25, 2004.*]

---

* PITTMAN and BAKER, JJ., would grant rehearing.

*Dodson & Dodson, L.L.P.*, by: *Richard N. Dodson*, for appellant.

*Winona Griffen*, for appellee.

JOHN B. ROBBINS, Judge. Appellant Robin Dansby appeals the order entered by the Miller County Circuit Court judge that changed joint custody between Robin and appellee Lathaire Dansby over their younger daughter Krysten to Lathaire's full custody. The parties married in 1984 and had Lynzi Dansby[1], born in 1985, and Krysten Dansby, born in 1997. They divorced at the end of July 1999, though the order was not entered until September 1999, but continued to live in the same household for another eight months, finally separating in the spring of 2000. Lathaire was the father of an older son in his twenties, two daughters born of his marriage to Robin, and a son conceived during the parties' marriage. The decree contemplated that the parties would have joint custody of Lynzi and Krysten. The decree specified that as concerned Krysten, the parties

---

[1] Lynzi turned eighteen in early 2003. Her custody/visitation is not at issue.

would alternate one-week periods of custody, from Friday evening to Friday evening. On three occasions leading up to the motion to change custody, Robin filed motions for contempt for Lathaire's failure to pay child support. Lathaire paid in full subsequent to each of these filings.

In response to the last of the three contempt motions filed by Robin, on November 27, 2002, Lathaire moved for contempt for Robin's failure to allow him his decreed joint-custody and moved to change custody based upon a change in circumstances. The cause was heard in January 2003, and the judge entered an order denying the contempt motion but granting the change of custody and allowing Robin visitation. This appeal resulted.

Appellant Robin challenges the trial judge's findings, asserting that they were clearly erroneous in two respects: (1) in concluding that there had been a material and substantial change in circumstances, and (2) in limiting Robin's visitation to alternate weekends, Wednesdays, alternate holidays, and one month in the summer. We affirm.

The standard of appellate review governing custody modifications is well settled. In child-custody cases, the primary consideration is the welfare and best interests of the child involved; all other considerations are secondary. *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000). Custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification is in the best interest of the child. *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002). In cases involving child custody and related matters, we review the case de novo, but we will not reverse a trial judge's findings in this regard unless they are clearly erroneous. *Deluca v. Stapleton*, 79 Ark. App. 138, 84 S.W.3d 892 (2002). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002).

The evidence at the hearing included the testimony of Lathaire, who testified that Robin basically let him have his younger daughter only when Robin was working her night shift at

the hospital, although this still permitted each parent one-half of Krysten's time. Lathaire was concerned that Robin was drinking, smoking, and having boyfriends spend the night with Krysten present. Lathaire said that some of Robin's boyfriends had criminal histories and that Krysten was witness to violence at Robin's house. In addition, Lathaire objected to Robin putting Krysten in a biracial situation by dating white men.

In contrast, Lathaire said that he lived in a three-bedroom house with his older son, his seventeen-year-old daughter Lynzi, and Krysten. Lathaire said he also saw his twelve-year-old son from another relationship at least once or twice a month and paid support for him. Lathaire confirmed that he had many brothers and sisters in the immediate area to help care for Krysten when he was at work as a car salesman or when he had to work at the family business, which apparently was a local bar or tavern.

Lathaire's main concern was that even though Robin always smoked, drank, and had boyfriends, he could not monitor Robin's behavior after they separated. Lathaire complained that her smoking was detrimental to Krysten's asthma, and he could not prevent her being drunk in front of their daughter, or her having boyfriends stay overnight.

Lathaire explained that his older daughter Lynzi did not have a relationship with her mother Robin because Robin berated her and they did not get along. Lathaire acknowledged that Lynzi was not a perfect child. Lynzi had undergone an abortion, but was currently on birth control. Lynzi had been suspended from school once after a fight in which she was not the original aggressor, but otherwise, she was a fairly good student.

Lathaire admitted that he was arrested once while driving in a caravan from a Razorback game back home and that the children were with him, but he explained that he did not understand the police to be trying to pull his car over, he had a minor wreck, he went to the station, and he waited with his children on a bench until posting bail. Lathaire also confessed that he had fallen behind in child support from time to time, but he thought that he had the right to do so when Robin denied his court-ordered visitation. He understood differently now. Lathaire said he had yet to have a female visitor over in Krysten's presence, and he was bothered by what he characterized as Robin's revolving door of boyfriends. Lathaire also said that Robin had kept his daughter out at a restaurant past her bedtime on a school night, and Robin was drinking.

Lynzi testified that she was a senior in high school, that she had no relationship with her mother, and that her mother did not even give her a birthday or Christmas gift. Lynzi testified that she observed her mother get drunk and smoke in front of Krysten, as well as have boyfriends spend the night while Krysten was present. Lynzi said that her mother said derogatory things about her father and his family. Lynzi said that her mother was currently dating a white man. Lynzi reportedly found marijuana in her mom's house but did not tell her about it. Lynzi helped to care for her little sister when her father had to be away, and she assisted in transporting her sister back and forth between houses. Lynzi wanted her little sister to live with her at their father's house.

Robin testified that she and Lathaire had never abided by the original decree but that they had arranged it such that they each had Krysten about half the time. In fact, they continued to live together for months until Robin moved out of the marital home. Thereafter, she said he had no problem with having 4-3 day splits during each week to accommodate her work schedule at the hospital. Robin said she had worked graveyard shift (7 p.m. - 7 a.m.) for about twelve years, and she said her mother helped with Krysten when work prevented her from being at home on those occasions when Lathaire insisted on the full-week exchanges. Robin agreed that she would go back to the seven days on, seven days off schedule if that was what Lathaire wanted. Robin agreed that Lathaire was a good father and that Krysten loved her dad and spent time with him. However, Robin believed that she had more time to spend with her daughter, and she saw no reason to depart from their practice in the past of arranging it so that Krysten would never have to be with a sitter. At the time of the hearing on this matter, Krysten was five years old.

Robin pointed out that she had to seek court intervention three times to get her child support, but Lathaire would pay prior to coming to court. As to morals, Robin reminded the court that Lathaire impregnated a woman with his now twelve-year-old son while he and Robin were still married. Robin also pointed out that she was not racist like Lathaire and that, concerning Lynzi, he was too lenient and did not discipline Lynzi, which led to the discord between Lynzi and her mother. Robin said that the specific acts that Lynzi testified about were untrue, and furthermore that Lynzi never spent any time with Robin so that Lynzi would have no way of knowing what went on in her household. Robin feared that

Krysten would befall the same behavioral problems later that Lynzi had already experienced by working her father against her mother.

Robin testified that she did not have a problem with one of Lathaire's sisters caring for Krysten because even though the aunt had apparently had a drug problem, she was good to Krysten. Robin said that she had a friend who formerly had a drug problem, but she underwent treatment and was better, similar to Lathaire's sister. Robin denied smoking in the house when Krysten was there, and she denied ever being drunk in front of her. Robin said that she did have a male overnight visitor once, but it was only because there was a winter storm and it was unsafe to leave. Robin denied any inappropriate behavior with him while Krysten was there. Robin explained that she did have Krysten out at Red Lobster on one occasion after her bedtime; Robin admitted to having one margarita. However, Robin said that this was a one-time occurrence.

Lathaire's older son Jason Dansby, age twenty, testified that he was in college and living with his father. Jason said he helped take care of Krysten when she was there, until their father got home from work at around 7:00 p.m. Jason said that only family members helped to care for Krysten when their father was at work.

Robin's mother testified that she knew Robin and Lathaire had made their own custody schedule since the divorce, accommodating Robin's work schedule. Robin's mother acknowledged that they did go back to the ordered schedule at least once, and she had to assist in keeping Krysten while her daughter worked. However, she said that Robin and Lathaire went right back to the altered schedule and that Lathaire never complained to her about it. She testified that she occasionally talked to Lathaire on the phone about the children and that they remained cordial.

The parties submitted their respective proposed findings of fact at the end of the case and thereafter the court filed its fifty-six findings of fact about what it believed to be true in the testimony. Apparently, everything negative about Robin was believed true, and everything positive about Lathaire was believed true. The most egregious bad acts found were that Robin smoked, drank, cursed, and cohabited with boyfriends in the presence of Krysten. He found that Lathaire provided a greater moral example and provided a more secure and structured life for Krysten than Robin. He found that Robin had allowed a known drug user in Krysten's presence and that Robin and a boyfriend engaged in domestic

violence in front of the children. The judge noted in his findings that Robin stated that she has no problems with Lathaire Dansby as a father and said that he is a good father. He found that they had not followed the ordered visitation due to Robin's fault, that material changes had occurred, and that Krysten's best interest would be to be placed in her father's custody. Robin was granted every-other-weekend, every Wednesday, alternate holiday, and one-month summer visitation. This appeal followed.

Before we consider the points on appeal in our de novo review, we must first make clear that one of the fifty-six findings of fact was an impermissible consideration. The trial judge stated in finding number thirty-nine that appellant, "a black woman, dates only white men." No objection was raised to the testimony on this issue at any time; nor did appellant object to this finding when it was proposed by appellee's counsel or when the trial court included it in its findings of fact and conclusions of law filed on March 21, 2003, some twelve days before the final order was entered. We do not consider an issue on appeal, even of constitutional concern, that has not been first raised to the trial court for resolution. See Gwin v. Daniels, 357 Ark. 623, 184 S.W.3d 28 (2004); Taylor v. Taylor, 345 Ark. 300, 47 S.W.3d 333 (2001); Tipton v. Aaron, 87 Ark. App. 1, 185 S.W.3d 142 (2004). This case is similar to the recently decided Tipton v. Aaron, supra, wherein the parties were litigating the question of whether custody of a child should be changed, and testimony was elicited from both parties concerning the impact of the child remaining in an interracial household with his mother. No objection was raised at any time to that line of inquiry, and we held that the issue was not preserved for our review. Likewise, in the present appeal, both parties shared their personal views about Robin's choice to date men of another race, no objection was raised until appeal to our court, and we again hold that this issue as not preserved for appellate consideration.

In response to the dissenting judges' assertion that the issue of race was first advanced by Robin, we disagree. Lathaire, as the moving party, testified first and made clear that he objected to his daughter being exposed to a biracial situation. Robin raised no objection. When Robin testified, she acknowledged that Lathaire did not like the fact that she dated white men, claimed that she did not teach prejudice, affirmed that Lathaire was a good father, and asked the court to leave intact the joint-custody arrangement. At

no time did she or her counsel claim that it was legally wrong to advance concerns about biracial dating as a basis for changing custody.

 Nevertheless, we take this opportunity to state that the United States Supreme Court made abundantly clear in *Palmore v. Sidoti*, 466 U.S. 429 (1984), that it violates the Equal Protection Clause of the Constitution to factor race into a custody decision. In *Palmore*, the *sole* consideration upon which custody was changed from the mother, who married a man of another race, to the father was that the child remaining in an interracial household would be detrimental to the child. The *Palmore* opinion, written by Chief Justice Burger, noted that the appeal raised important federal concerns arising from the Constitution's commitment to eradicating discrimination based upon race and that the Court was compelled to reverse the decision to change custody made only on racial considerations.

 Even though no objection was raised to the inappropriate finding number thirty-nine, we do not find on our de novo review that it is of any consequence inasmuch as it neither strengthens nor weakens either party's position on the best interest of the minor child. Therefore, we proceed in our de novo review to examine the remaining fifty-five findings of fact to determine whether they support the conclusion that material changes occurred and that it was in Krysten's best interest for Lathaire to be granted custody. We hold that those findings support the trial court's decision, and we affirm.

 In determining whether a change in custody is warranted, the trial judge must first decide whether there has been a material change in circumstances since the most recent custody order. *Word v. Remick*, 75 Ark. App. 390, 58 S.W.3d 422 (2001). The burden of proving such a change is on the party seeking the modification. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 777 (1986). While custody is always modifiable, in order to promote stability and continuity for the children and to discourage repeated litigation of the same issues, our courts require a more rigid standard for custody modification than for initial custody determinations. *Vo v. Vo, supra.*

 Joint custody or equally divided custody of minor children is not favored in Arkansas. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). The relevant statute, Ark. Code

Ann. § 9-13-101(b)(1)(A)(ii), was amended in 2003 to specifically permit the court to consider the award of joint custody. However, the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of joint custody. *See Hansen v. Hansen*, 11 Ark. App. 104, 666 S.W.2d 726 (1984). When the parties have fallen into such discord that they are unable to cooperate in sharing the physical care of the children, this constitutes a material change in circumstances affecting the children's best interest. *Word v. Remick, supra.* Moreover, our courts have never condoned a parent's promiscuous conduct or lifestyle when conducted in the presence of the child. *Hepp v. Hepp*, 61 Ark. App. 240, 968 S.W.2d 62 (1998).

 ██ Applying the proper standard of review to the order on appeal, we affirm. Here, the change in circumstances was that Robin's bad acts were happening in the presence of the child, where they were presumably hidden before the divorce. To her detriment, the judge believed the testimony that Robin had men in the house overnight at least once while the children were present; that marijuana was found in Robin's house by Lynzi; that Robin spoke disparagingly of Lathaire in the children's presence; that Robin was drunk and smoked in front of the asthmatic child; and that while the parties were able to work out the schedule most of the time to give each other one-half of Krysten's time, they were in disagreement now. The judge apparently was persuaded by Lathaire's explanations for not paying child support when he was frustrated, and for his arrest in the children's presence. We must defer to the credibility calls made by the trial judge. Moreover, joint custody should only stand where the parties are very agreeable. *See Word v. Remick, supra.* Given the standard of review, we affirm the change from joint custody of Krysten to Lathaire having full custody.

In contrast to the dissenting judges, we do not see this, after credibility determinations were made, to be a "close case." If we sat as the finders of fact on credibility, we might have also determined this to be a close case. However, de novo review requires that we examine the record as a whole, but it does not allow us to change what testimony was believed true or untrue as found by the trial judge. With the extensive findings of fact, clearly demonstrating that the trial judge believed Lathaire to be a better

moral, stable, and proper parent for Krysten than Robin, we are not left with a definite and firm conviction that a mistake was committed.

 Robin's second point on appeal asserts that if the change of custody is affirmed, the trial court committed reversible error in granting her limited visitation with Krysten. We disagree. We review cases such as this de novo and reverse only when the trial court's findings are clearly erroneous. *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003). A finding is clearly erroneous when, despite the existence of evidence supporting it, we have the definite and firm conviction based on the entire evidence that a mistake was committed. *Id.* We are not left with such a definite and firm conviction in this case.

 Robin states in her brief that she should be given "the same visitation that Mr. Dansby had for four years." She is in error. The parties had joint custody, and the trial court's order changed this to full custody in Lathaire. Consequently, it was incumbent upon the trial judge to set appropriate visitation for the non-custodial parent, Robin. The order changing custody set visitation as every other weekend, every Wednesday, and "the Standard Visitation schedule concerning holidays and all other general provisions of the Standard Visitation schedule which is attached as Exhibit 'A' in regard to all other visitation." Standard visitation provided alternating holidays and thirty days during the summer. Robin has not demonstrated clear error where she was granted visitation in conformity with the trial judge's typical practice concerning non-custodial parents.

Affirmed.

STROUD, C.J., BIRD, and CRABTREE, JJ., agree.

PITTMAN and BAKER, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, dissenting. The parties to this child-custody case were divorced on September 14, 1999. Pursuant to the divorce decree, the parties were awarded joint custody of their daughter, Krysten, who was born in 1997. The decree further provided that physical custody of Krysten was to alternate between the parties every other week, and that appellee was to pay child support in the amount of $130.00 per week. In September 2003, appellant filed a motion for enforcement of the decree and

contempt seeking a child-support arrearage of $3,700.00. This was the third time that appellant was forced to resort to the court to obtain the support appellee had been ordered to pay for the benefit of his child. Appellee answered with a request for a modification of custody. After a hearing, the trial judge entered an order awarding full custody to appellee. This appeal followed.

Appellant argues that the trial court erred in basing his findings of material change of circumstance and best interest on the fact that appellant, a black woman, has dated only white men since the divorce, thereby exposing the child to what appellee, who is also black, characterized as a harmful "biracial situation." The majority, while conceding that the trial court did base its order on this factor and that this was contrary to the law, does not address the issue, holding that it was not preserved for appeal because appellant did not object below. The majority also opines, in *dicta*, that the error was of no consequence in any event. I disagree, and I dissent.

The majority errs in holding that the issue was not preserved for appeal. First, because appeals in equity cases are reviewed *de novo*, there is no requirement of contemporaneous objections to the findings, conclusions, and decree of the court to obtain review on appeal. *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000); *Morrow v. Morrow*, 270 Ark. 31, 603 S.W.2d 431 (1980); Ark. R. Civ. P. 46. Indeed, even had the trial judge announced his erroneous application of the law in open court before the parties had left the courtroom, no objection would be required to preserve this issue for appeal. *See Jones v. Abraham, supra; compare Jones v. Abraham*, 67 Ark App. 304, 312, 999 S.W.2d 698, 703 (1999). Second, although it is true as a general rule that a party must object at trial in order to preserve an issue for appeal, an exception arises when the error is made by the trial judge himself at a time when defense counsel has no knowledge of the error and hence no opportunity to object. *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). That is precisely what occurred in the present case. The evidence regarding appellee's views regarding racially-mixed couples and households was first elicited not by the appellee, but rather *by the appellant herself for the purpose of showing that appellee was racially biased* and that this bias was harmful to the child.[1]

---

[1] There was no occasion for appellant to object to appellee's testimony regarding what he characterized as a "biracial situation." Granted, it was appellee who first testified that he

That this is a proper purpose there can be no doubt. In the recently-decided case of *Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004), this very court, on *de novo* review, cited a parent's lack of tolerance toward the other parent's interracial household as a factor warranting reversal of a trial court's award of custody, so as to place the child in the custody of the parent whose child-rearing philosophy promoted racial tolerance. Appellant simply had no reason to anticipate that the trial judge would turn the law on its head and view the evidence of appellee's bigotry as a factor favorable to appellee until the trial judge's final order demonstrated that he had done so.[2]

---

objected to his ex-wife dating white men. However, this testimony was not prompted by questions asked by appellee's own attorney on direct examination, but was instead directly responsive to a question asked by *appellant's* attorney on *cross*-examination. This question was clearly designed to show that appellee was racially bigoted, and appellee's testimony to that effect was incontestably "elicited" by appellant. *See Turner v. State*, 59 Ark. App. 249, 254, 956 S.W.2d 870, 873 (1997).

[2] Oddly, the majority states that the preservation question in this case is "similar to the recently decided *Tipton v. Aaron*." Insofar as the purpose of an objection is to draw the trial judge's attention to an asserted error, it is difficult to imagine more dissimilar circumstances. In the present case, as discussed *supra*, there was no reason for appellant to suppose that evidence of appellee's racial intolerance, elicited by appellant's attorney for the manifestly proper purpose of showing a lack of fitness on appellee's part, would be viewed by the trial judge as a factor favorable to appellee. The error did not become apparent until the proceeding had concluded and the trial judge's error was demonstrated for the first time in his findings of fact. In contrast, the testimony in *Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004), was elicited by the appellee in that case not for the proper purpose of showing that a prospective custodian's bigotry was detrimental to the child, but instead solely and directly for the manifestly improper purpose of demonstrating that a child reared in an interracial family would be harmed by private biases, which is precisely what the United States Supreme Court expressly forbade twenty years ago in *Palmore v. Sidoti*, 466 U.S. 429 (1984). The error was so plain in *Tipton v. Aaron*, *supra*, that the trial judge himself raised the question of the propriety of considering this circumstance, yet the appellant in that case still raised no objection. It is an understatement to say that that is not the situation before us in the present case.

Oddest of all, perhaps, is that the majority strains to discern a parallel between this case and *Tipton v. Aaron* on the issue of preservation, while simultaneously ignoring the striking similarity of the facts with respect to the merits. Confronted with evidence of the father's racial intolerance in *Tipton v. Aaron*, we used that evidence to support the reversal of an award of custody to that father — and did so despite the fact that the issue had, in effect, been expressly waived at trial. In the present case, where there was no reason to object at trial, the majority ignores the question of the father's racial intolerance and states that it is of "no consequence" because "it neither strengthens nor weakens either party's position on the best interest of the minor child." The issue in both cases is identical — whether the father's

There is no question that the trial court erred in considering appellant's dating persons of another race as a factor in awarding custody to appellee. The impact on the child from remaining in a racially-mixed household is not a proper consideration in determinations of child custody. The United States Supreme Court addressed a similar situation in *Palmore v. Sidoti*, 466 U.S. 429 (1984). Chief Justice Burger, writing for the Court, said that:

> It would ignore reality to suggest that racial and ethnic prejudices do not exist or that all manifestations of those prejudices have been eliminated. There is a risk that a child living with a stepparent of a different race may be subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin.

> The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. "Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held."

*Id.* at 433 (internal citations omitted).

Nor do I agree with the majority's suggestion that this error was harmless. This was a close case. Although there was evidence that appellant's behavior has not at all times been exemplary, weighing against that evidence is the established and undeniable fact that appellee has three times required appellant to resort to the court to obtain the child support that appellee had been ordered to pay. There was, in addition, appellee's racial intolerance, which the trial court not only failed to weigh against him but instead viewed with approbation. Particularly poignant, to me, is appellee's own testimony that, upon encountering the interracial couple of appellant and her boyfriend in a restaurant, his elder daughter was mortified, while Krysten "being a five-year-old kid knows no

---

child-rearing philosophy promotes racial tolerance — and I respectfully submit that it cannot be grounds for changing custody in one case and of no consequence whatsoever in the next.

different.'' One cannot help, upon reading this, but to reflect that the elder daughter has already learned the painful and divisive lesson of racial bigotry that the child whose custody is here at issue has yet to be taught.

Although the trial judge's findings were generally favorable to appellee and unfavorable to appellant, there is no way to determine, on this record, how much his erroneous view of the law influenced his decision or, indeed, the other findings set out in his order. I do not think that we should presume that the trial court's error is indicative of bias on its part, but neither do I think that we should summarily deny appellant the opportunity to raise that issue should she desire to do so. In similar situations, where the trial court has erred as a matter of law in awarding custody, we have reversed and remanded to allow such further proceedings as might be necessary to determine the question of custody to be conducted in the trial court. *See Walker v. Torres*, 83 Ark. App. 135, 118 S.W.3d 148 (2003). I believe that we should do likewise in the case at bar.

I respectfully dissent.

K AREN R. BAKER, Judge, dissenting. In this case, the trial court ordered a child removed from the custody of its mother, specifically listing racial bias as one reason for the custody determination. That reason alone renders the ordr inherently suspect, and that fact alone demands reversal. To do otherwise not only tolerates, but gives to, racial bias which the law can neither tolerate nor allow. *See Palmore v. Sidoti*, 466 U.S. 429 (1984); *Tipton v. Aaron*, 87 Ark. App. 1, 185 S.W.3d 142 (2004).

Therefore, I dissent.