In July 2015, the circuit court entered a divorce decree wherein the parties agreed that they would share joint custody of their child, seventeen-month-old L.P., and that Jill would receive reasonable child support. The decree provided that "each party shall have one week on and one week off of possession of the minor child." In October 2016, Phillip moved to modify the custody arrangement, alleging that a material change of circumstances had occurred and requesting that joint custody be modified so that he would be the primary custodian with Jill exercising visitation. In March 2017, the court entered an agreed modification order in which the parties agreed that both were enjoined from the following conduct:
a. disturbing the peace of the child or of the other party.
b. hiding or secreting the child from the other party.
c. making disparaging remarks regarding the other party or the other party's family in the presence or within the hearing of the child or on any form of social media.
d. discussing any litigation concerning the child in the presence or within the hearing of the child or on any form of social media.
e. using illegal drugs, drugs for which the parties do not have a valid prescription within the twelve (12) hours before or during the periods of possession of or access to the child.
In March 2018, Phillip again moved to modify the custody arrangement, contending that a material change of circumstances had occurred since entry of the modification order. He alleged that Jill had "consistently and systematically failed to act in the best interest of the minor child. Moreover, she [has] engaged in conduct that is harmful to the minor child." Phillip again asked that joint custody be modified so that he would be the primary custodian with Jill exercising visitation. He also alleged that Jill was using or had used illicit drugs recently during periods in which L.P. was in her care, and he asked that the court order Jill to submit to drug testing. Jill answered and denied Phillip's allegations; she also accused Phillip of harassing her by filing multiple motions to modify and asked for full attorney's fees.
On 2 May 2018, the circuit court ordered that Jill and her boyfriend, Sean Lancaster, submit to drug testing. On June 25, the court convened a final hearing on Phillip's motion to modify. Jill testified that since the last modification hearing in March 2017, she had discontinued her pursuit of an undergraduate degree and had moved out of her parents' house. She said she now resides in a rental property and shares the property with two adults and their sixteen-year-old son. She is currently employed as a long-term substitute teacher for the Texarkana, Arkansas, Independent School District. She testified that she and Sean Lancaster were no longer a couple. She denied that she would ever drink excessively or use illegal drugs around L.P. She agreed that L.P. was enrolled at Trinity Christian School in the Pre-K program *287 (K-3) and stated that early dropoff begins at 7:30 a.m. and school ends at 3:15 p.m. She said that according to the school handbook, every toddler needs to be in his or her classroom by 9:00 a.m.[1] She acknowledged that L.P. had missed several days of school while in her care (reasons unknown). She also acknowledged that she had exchanged text messages with Niraj Krishna in December 2017 and January 2018 and that some of those texts contained sexually explicit language and photographs. She also agreed that some texts contained derogatory comments about her students and references to drinking and intoxication. She admitted that one text referenced cocaine being in her system, but she denied that she had consumed any illegal drugs since January 2017. She asserted that she had not had any overnight guests with L.P. present. She did agree that she had invited Niraj to her house and asked him to bring beer after L.P. was asleep.
On cross-examination, Jill confirmed that L.P. had been late to school (9:15 a.m.) once and that she (Jill) had been late (by a few minutes) picking up L.P. from aftercare once.[2] Jill also said that she and Phillip had briefly reconciled after the last court order was entered but that he had now remarried after dating his current wife for four months. Jill agreed that she had difficulties with Phillip's new wife, Lacy. She also admitted that she had started teaching fulltime in October 2017 but had been terminated for alleged drug use. She continued working as a substitute teacher, however, and is employed at Pecan Point Brewery for the summer. She confirmed that she had taken the court-ordered drug test and that the results were negative.
Allison Munn, L.P.'s K-3 teacher at Trinity, testified via deposition that she had interacted with both of L.P.'s parents and had seen a lack of consistency in Jill's parenting. Munn also said that Jill had not always paid attention during parent/teacher conferences and that she had sometimes failed to send the requisite school supplies with L.P. Munn observed a difference in L.P.'s behavior during the weeks she is with Jill compared to the weeks she is with Phillip; according to Munn, "Mom's week, [L.P.] is always exhausted, tired, her behavior is completely different, she is very defiant[.]" But during Phillip's week, L.P. is "not tired at nap time, she kind of flips all around because she's not exhausted." Munn agreed that based on her observations over the past year, she had developed concern for L.P.'s educational development and her safety and well-being while in her mother's care.
Elizabeth Foster, who teaches the summer program at Trinity, testified that the school prefers that students be there by 8:15 a.m. Foster said that the week of June 11, when L.P. was in Jill's care, L.P. was dropped off on Monday at 8:00 a.m., picked up at 5:15 p.m. from extended care, and did not attend the rest of the week. During the week that L.P. was in Phillip's care, L.P. was signed in between 7:45 and 8:00 a.m. each day and picked up between 3:00 and 3:15 p.m. Foster also testified there was one day that Jill did not provide an appropriate lunch for L.P. because it did not contain a meat product, but that during Phillip's weeks, L.P. had a sufficient lunch. On cross-examination, Foster *288 agreed that L.P. is at an appropriate education level and is a good student.
Niraj Krishna testified that he had used cocaine with Jill once in December 2017 and again in January 2018. He also said that there had been times that he had visited Jill at her home while L.P. was asleep. He confirmed that he had visited Jill's house in the middle of the night when L.P. was present. He also described one instance in which he met Jill for lunch and she consumed more than one alcoholic beverage then left to pick up L.P.
Phillip testified that he is a physician and that he lives with his wife and their three children (his wife's two children from a previous marriage and L.P.). He said that he believed there had been a material change of circumstances since the entry of the last order; he explained that after Jill had moved out of her mother's house, Jill began exhibiting different behaviors that he believed negatively impacted L.P. He took no comfort in the fact that Jill's drug test was negative because "[i]t was done almost six months after she was doing this" and "[s]he's always had problems." He also said that he saw behavioral changes in L.P. after being in her mother's care; specifically, L.P. picks up sticks and imitates smoking, is tired, and has trouble readjusting her sleep schedule. Phillip also voiced concern over two injuries that L.P. has suffered in the past year: (1) a burn on her hand and (2) a vaginal tear that was discovered by a worker at Trinity.[3] After the discovery of the second injury, L.P. was taken to a medical provider, and according to Phillip, when Jill arrived at the doctor's office, "she appeared to be under the influence of something" and "smelled of marijuana." Phillip testified that he was "not really" able to communicate with Jill in an "adult to an adult type manner." He expressed concern with the individuals with whom Jill associates, the roommates in her house, and Jill's general state of mind and "erratic behavior." Phillip said that he is the more appropriate parent to take care of L.P.'s essential needs and asked that he be designated the primary custodial parent with Jill exercising standard visitation. He stated that if he was not L.P.'s primary custodial parent, he was worried about future conflict because "[w]e can't agree on anything now." On cross-examination, Phillip admitted that to his knowledge, Jill had not received any DWIs or been arrested for using any illegal substance since the last court order. Regardless, he said that he believes Jill has a problem with drugs and is actively using drugs.
Sharon Pace, Phillip's mother, testified that she lives near Phillip and his family and that during Phillip's custody weeks, she spends Tuesday nights with L.P. Sharon recalled an incident in December 2017 in which Jill came to Sharon's house to pick up L.P. and Sharon thought she smelled alcohol on Jill. Sharon called the police, but when they arrived fifteen minutes later, Jill had left. Sharon expressed concern for L.P.'s safety and well-being while in Jill's custody.
After Phillip rested, Jill asked that the motion be dismissed, asserting that no material change of circumstances had been proved. The court found that "since the entry of the last order, that there has been a sufficient change of circumstances on both sides for the court to consider the best interest of the child at this point in *289 time under the present custody arrangement, so I'll let you go forward on that."
Linda Lowe, Jill's coworker, testified that she sees Jill every day and that she has never had a reason to question Jill's sobriety. Lindsay Franklin, another coworker, testified that she had known Jill for twenty-five years, that Jill is one of the best mothers she knew, and that she never had any reason to suspect that Jill was under the influence of drugs.
Marsha Hardin, Jill's mother, testified that she had been with L.P. when she injured her hand. Hardin explained that she and L.P. had been cooking eggs; that L.P. had been standing on a chair; and that the chair wobbled, causing L.P. to instinctively reach out and catch herself and in so doing touch the burner on the stove. Hardin said she ran cold water over the burn, applied aloe gel, and bandaged L.P.'s hand. L.P. had a school performance that night, so Hardin gave L.P. a mitten to wear over the bandage to protect it.
Jill again took the stand and testified that she had not been notified on the day that L.P.'s lunch was deemed inadequate and that she had made a sandwich for L.P.'s lunch the night before but had forgotten it. She also said she regretted the texts between her and Krishna but maintained that she had not had any overnight guests when L.P. was present. She testified that she and Phillip do not have any communication with each other and that she primarily communicates with Lacy. Upon questioning by the court, Jill explained that they exchange custody of L.P. at each other's homes.
On 17 July 2018, the court entered a written order containing the following findings:
The Court finds that it was established by a preponderance of the evidence that Defendant used cocaine on one occasion since the last Order. The Court does not find that such evidence warrants a change in the custody order previously entered in this cause.
The Court further finds the Defendant has met the child's educational needs and most of the other evidence presented was personal in nature and would not have been known by the child or impacted the mother-daughter relationship.
Both parties are required to use due diligence to protect the safety and well being of the child. There was no evidence presented that Defendant's current renters have harmed or would harm the child. ... The Court finds that there ha[ve] been material changes of circumstances in the lives of both parties since the last order. However, it is not in the best interests of the child to modify the joint custody agreed to by the parties in their Decree of Divorce dated on July 16, 2015.
The court denied Jill's request for attorney's fees. Phillip has appealed the denial of modification of custody, and Jill has cross-appealed the denial of attorney's fees.
I. Best Interest
Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. Anderson v. Thomas , 2013 Ark. App. 653, 2013 WL 5964473. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. Id. The reason for requiring more stringent standards for modifications than for initial custody determinations is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. Id.
*290 The party seeking modification of the custody order has the burden of showing a material change in circumstances. Anderson, supra. To change custody, the circuit court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the children. Id. In reviewing child-custody cases, we consider the evidence de novo but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. Preston v. Preston , 2014 Ark. App. 58, 2014 WL 245783. Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. Ford v. Ford , 347 Ark. 485, 65 S.W.3d 432 (2002). There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. See Vo v. Vo , 78 Ark. App. 134, 79 S.W.3d 388 (2002).
Phillip begins by citing the general law on joint custody. He notes that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of joint custody, and when the parties have fallen into such discord that they are unable to cooperate in sharing the physical care of the children, this constitutes a material change in circumstances affecting the children's best interest. See Doss v. Miller , 2010 Ark. App. 95, 377 S.W.3d 348. It is reversible error, he says, to order continuation of a joint-custody arrangement when there is evidence that the parents can no longer cooperate in reaching decisions in matters affecting their children. See Montez v. Montez , 2017 Ark. App. 220, 518 S.W.3d 751. That is the basic law.
Phillip asserts that such a situation exists in this case: he and Jill "have reached a state where they simply cannot agree on the correct actions to take parenting [L.P.]," and Jill's actions "indicate poor judgment and wholly undermine Phillip's confidence that she will act in the best interest of L.P." Phillip likens this case to Dansby v. Dansby , 87 Ark. App. 156, 189 S.W.3d 473 (2004), in which this court affirmed a circuit court's modification of joint custody. This court held:
Here, the change in circumstances was that Robin's bad acts were happening in the presence of the child, where they were presumably hidden before the divorce. To her detriment, the judge believed the testimony that Robin had men in the house overnight at least once while the children were present; that marijuana was found in Robin's house by Lynzi; that Robin spoke disparagingly of Lathaire in the children's presence; that Robin was drunk and smoked in front of the asthmatic child; and that while the parties were able to work out the schedule most of the time to give each other one-half of Krysten's time, they were in disagreement now. The judge apparently was persuaded by Lathaire's explanations for not paying child support when he was frustrated, and for his arrest in the children's presence. We must defer to the credibility calls made by the trial judge. Moreover, joint custody should only stand where the parties are very agreeable. Given the standard of review, we affirm the change from joint custody of Krysten to Lathaire having full custody.
Id. at 166, 189 S.W.3d at 480 (internal citation omitted) (emphasis added). Phillip *291 contends that this court should award him sole custody of L.P.
In response, Jill notes that Phillip's motion did not allege that she had violated any of the conduct that was enjoined in the 2017 agreed modification order; instead, he made a general allegation that Jill had acted in ways harmful to L.P. and not in L.P.'s best interest. But there was no evidence that Jill's alleged improper conduct occurred in L.P.'s presence or negatively affected her. Nor was there evidence that Phillip's other concerns- such as L.P.'s check-in time at preschool, her isolated injuries, and Jill's current living arrangements-had affected L.P. negatively or been caused by Jill's conduct. For her part, Jill says that there was no testimony that the parties' relationship had deteriorated to such a degree that modification of the custody arrangement was necessary. The weekly exchanges of custody have occurred without incident, no one testified that they did not agree on L.P.'s current education, and "[w]hile there may well be a lack of trust among [Phillip] and [Jill], it has not proven to be an issue that prevents the parties from amicably following the terms of the Agreed Modification Order on a regular basis." Jill concludes that the circuit court acted within its discretion in evaluating the credibility of the witnesses, seeing beyond the "petty disputes" that are commonly seen in custody cases, and deciding that four-year-old L.P. should not be denied equal time with both parents.
There are some concerning aspects to this case, but on the whole we agree that the evidence did not demonstrate that the parties have reached a state of discord and animosity to a degree and frequency that they cannot communicate and agree on the proper care for their child. They have arranged a weekly pick-up and drop-off schedule that works for both parties, neither party asserts that L.P.'s school situation should be changed, and L.P. is a happy and healthy young girl. In addition, many of the instances cited by Phillip as evidence of bad parenting by Jill consist of what appear in the record to be one-time occurrences: late to school once, picked up late from aftercare once, and one school lunch that was deemed inappropriate-a protein was missing one day. And while one teacher expressed concern for L.P. while in Jill's care, another teacher did not and noted that L.P. is at an appropriate education level for her age and is a good student. The circuit court, not this court, observed the witnesses and parties and decided how to weigh and credit the testimony. Under our standard of review, we are duty bound to defer to the circuit court's better vantage point for discerning what custody arrangement between these parents is in the child's best interest. Sharp v. Keeler , 103 Ark. App. 233, 288 S.W.3d 256 (2008). The case law cited by Phillip, Dansby v. Dansby , confirms that this court must defer to the circuit court's credibility determinations, especially in this case, which is a quintessential "judgment call." Consequently, we affirm.
II. Attorney's Fees
A circuit court has inherent power to award attorney's fees in domestic-relations proceedings, and whether to do so and the amount thereof are matters within the circuit court's discretion. James v. Walchli , 2017 Ark. App. 645, 535 S.W.3d 679. Given the circuit court's intimate acquaintance with the record and the quality of services rendered, we usually recognize the superior perspective of the circuit court in determining the issue of attorney's fees. Id. A circuit court's decision related to attorney's fees will not be disturbed on appeal absent an abuse of discretion. Id.
*292 Jill argues that there have been four motions filed and three hearings held since the parties' divorce, and while Phillip is a physician with more financial resources, she has a limited income and relies heavily on the child-support payments she receives from Phillip. She argues that she should not be penalized for her lack of resources, nor should L.P. "be penalized from child support funds having to be diverted to fight her Father's multiple motions, none of which have resulted in a change of custody." Phillip counters that Jill's actions have justified his concerns for L.P.'s well-being and notes that even the circuit court found a material change of circumstances. Therefore, he argues, the circuit court did not abuse its discretion in denying attorney's fees.
The circuit court denied attorney's fees for both parties, and we see no abuse of discretion in that decision.
Affirmed on direct appeal; affirmed on cross-appeal.
Switzer, Whiteaker, Vaught, and Hixson, JJ., agree.
Abramson, Virden, Gladwin, and Brown, JJ., dissent.

According to the Trinity handbook, "Toddler and Preschool (K2 and K3) class begins at 8:15 a.m. and students should be signed in no later than 9:00 a.m."

Aftercare service concludes at 5:30 p.m.; on that day, Jill was pulling into the parking lot when the school called her at 5:30 p.m.

An investigation into L.P.'s injury concluded that she had a urinary-tract infection and a straddle injury, which can be caused from falling off a bike or straining while using the bathroom. The investigation concluded that the injury was not caused by child abuse or neglect.