Cite as 2020 Ark. 108

# SUPREME COURT OF ARKANSAS
## No. CV-18-787

| | | |
|---|---|---|
| | | **Opinion Delivered** March 12, 2020 |
| PHILLIP GRANVILLE PACE | | |
| | | APPEAL FROM THE MILLER COUNTY |
| | APPELLANT | CIRCUIT COURT |
| | | [NO. 46DR-15-245] |
| V. | | |
| | | HONORABLE BRENT HALTOM, |
| JILL COBURN PACE | | JUDGE |
| | | |
| | APPELLEE | AFFIRMED ON DIRECT APPEAL AND ON CROSS-APPEAL; COURT OF APPEALS' OPINION VACATED. |

**JOSEPHINE LINKER HART, Justice**

Phillip Granville Pace appeals from an order of the Miller County Circuit Court denying his petition to modify a joint-custody order and give him primary custody of his minor daughter, L.P. The circuit court also denied Jill Coburn Pace's petition for attorney's fees. On appeal, Phillip argues that the circuit court erred by continuing joint custody and denying him primary custody. On cross-appeal, Jill argues that the circuit court erred in denying her petition for attorney's fees. We affirm on direct appeal and on cross-appeal.

This case was originally filed in the court of appeals, which affirmed by a vote of 5–4. *Pace v. Pace*, 2019 Ark. App. 284, 578 S.W.3d 284. We granted Phillip's petition for review. When we grant a petition to review a decision of the court of appeals, we treat the matter as if the appeal had been originally filed in this court. *Arms v. State*, 2015 Ark. 364, 471 S.W.3d 637.

## I. *Direct Appeal*

Phillip and Jill were divorced by a decree entered on July 16, 2015. A single child, L.P. was

born of the marriage on January 19, 2014. In accordance with the parties' agreement, the circuit court ordered joint custody of L.P. Each parent was to have physical custody of the child on alternating weeks. The decree specified that "[n]either party shall be primary custodian, and both parties shall have equal rights and duties." Further, the decree specified that the following special provisions shall apply equally to both parties for the best interests of the minor child:

• No overnight guests of the opposite sex with whom a parent has a romantic relationship when the minor child is in that parent's possession;

• Neither parent shall be intoxicated by alcohol or drugs when in possession of the minor child;

• Neither parent shall make disparaging remarks about the other parent or their family to any third party in the presence of the child.

The decree also specified that, due to the disparity in the parties' income and earning potential, Jill would receive $2250 per month in child support from Phillip.

Phillip challenged the joint-custody arrangement shortly after it was entered. He filed his first motion to modify custody on October 17, 2016. Phillip sought to be named primary custodian of the child and for Jill to receive supervised visitation. At a January 11, 2017 hearing on that motion, Jill's substance abuse was made an issue, although Phillip admitted that he was aware of Jill's addiction to prescription painkillers when he agreed to joint custody in the divorce decree. In disposing of the October 17 petition, the circuit court did not change custody; however, an agreed modification order was entered on March 23, 2017. The order prohibited the parties from:

a. disturbing the peace of the child or of the other party.

b. hiding or secreting the child from the other party.

c. making disparaging remarks regarding the other party or the other party's family in the presence or within the hearing of the child or on any form of social media.

d. discussing any litigation concerning the child in the presence or within the hearing of the child or on any form of social media.

e. using illegal drugs, drugs for which the parties do not have a valid prescription within the twelve (12) hours before or during the periods of possession of or access to the child.

On March 14, 2018, Phillip again petitioned for change of custody. That same day, he filed a motion for drug testing. A hearing on the motion for drug testing was conducted on May 1, 2018. Jill was ordered to undergo testing. Jill's boyfriend at the time, Sean Lancaster, was also ordered to submit to drug testing. On May 3, 2018, Jill submitted to drug testing and tested negative. Lancaster apparently never submitted for testing, but his relationship with Jill ended.

A subsequent hearing on the motion to change custody was held on June 25, 2018. Jill testified that she moved from her mother's house to a residence she shares with two adults and their sixteen-year-old son. She stated that she was no longer pursuing an undergraduate degree through Texas A&M. During the school year, Jill stated that she worked as a long-term substitute teacher with the Texarkana Arkansas Independent School District. Because school was in recess, she had a job at Pecan Point Brewery. Jill asserted that she did not drink to excess or consume illegal drugs around L.P. Jill claimed that her prescription pain medication addiction was under control and that she was "attending meetings."

Jill stated that L.P. was currently enrolled in a prekindergarten program at Trinity Christian School. According to Jill, "drop-off" starts at 7:30 a.m., and instruction ends at 3:15 p.m. After that, "extended care" begins. Jill stated that she understood the school policy was that children L.P.'s age were not required to be in class before 9:00 a.m. She admitted that she occasionally kept L.P. in extended care when it was necessary for her job duties. Jill recalled that when she had worked as a dental assistant, her need for extended care was greater and admitted that one time she picked L.P.

3

up at "5:31." Jill acknowledged that while L.P. was in her care, the child missed several days of the prekindergarten program. According to Jill, the only problem she has with the school involved L.P. needing a "nap mat," which she was surprised to find was no longer at the school in spite of the fact that she and Phillip had provided such a mat for more than two years. Jill questioned Phillip about the nap materials, and she claimed she was told that after he had remarried, he concluded that she should provide her own nap mat for the time that she had L.P.

Phillip extensively probed Jill's personal life. Jill testified that her relationship with Lancaster had ended after the March 2017 hearing. Phillip also questioned her at length about text messages that she had exchanged with Niraj Krishna in December 2017 and January 2018, apparently with the goal of proving that she was intoxicated while she had custody of L.P. The texts made references to drinking and intoxication as well as cocaine being in her system, but she denied that she had consumed any illegal drugs since January 2017. Despite the racy content of some of the text messages, Jill asserted that she had not had any overnight guests with L.P. present. She did, however, agree that, after L.P. was asleep, she had invited Niraj to her house and asked him to bring beer.

Jill testified that she and Phillip had briefly reconciled after the last court order was entered and had discussed remarrying. According to Jill, after "dating" Phillip, she moved back in with Phillip for approximately six weeks. However, she discovered a voice recorder placed in the backpack that L.P. took to school on a daily basis. She also discovered a GPS tracker and that Phillip had intercepted her bank statements. Jill further stated that she read Phillip's journal in which he wrote that his plan for reconciliation was merely a ploy to spend more time with L.P. Jill testified that they "broke things off officially" in August 2017, and Phillip married his current wife four months later. Jill agreed that she had difficulties with Phillip's new wife, Lacy. She recounted confrontations with

4

Lacy both at Jill's residence and at a hospital emergency room.

Phillip next introduced the deposition testimony of Allison Munn, L.P.'s K-3 teacher at Trinity. Munn testified that she had interacted with both of L.P.'s parents and that she had seen a lack of consistency in Jill's parenting. Munn also said that Jill had not always paid attention during parent/teacher conferences. Munn claimed that Jill had sometimes failed to send the requisite school supplies with L.P. Munn also claimed that she noted a difference in L.P.'s behavior during the weeks she is with Jill versus when she is with Phillip. Munn opined that L.P. was "always exhausted" and that she acted "very defiant." Conversely, during the weeks that the child is with Phillip, L.P. is "not tired at nap time, she kind of flips all around because she's not exhausted." Munn agreed that over the past year, she had become concerned over L.P.'s educational development and safety while the child was in her mother's care.

Elizabeth Foster, a teacher in Trinity's summer program, testified that the school "prefers" that students arrive by 8:15 a.m. When in Jill's care, however, L.P. arrived at the school after the preferred time, and the child would regularly be picked up after 5:00 p.m. In contrast, when L.P. was in Phillip's care, L.P. was signed in between 7:45 and 8:00 a.m. and picked up between 3:00 and 3:15 p.m. Foster also provided a photograph of one of L.P.'s lunches that she claimed did not meet Trinity's standards because there was "no meat in it." The picture showed that L.P.'s lunch consisted of several items, but no sandwich. On cross-examination, Foster admitted that she was acquainted with Phillip's new wife Lacy because Lacy's children from a previous relationship attended Trinity. Foster noted that it was Lacy who picked up L.P. while the children were in Phillip's care. Foster also admitted that when L.P. brought the infamous nonconforming lunch, she had not spoken to Jill about it, but had brought it to Lacy's attention. Nonetheless, Foster agreed that L.P. is at an

appropriate education level and is a good student.

Niraj Krishna testified that he had used cocaine with Jill once in December 2017 and again in January 2018. He also said that "once or twice" he had been "partying with Jill" at her home while L.P. was asleep. Krishna stated that he did not want to be seen by L.P. because he is friends with Phillip, and he did not want to "confuse" her when she saw him at Phillip's house. He stated that he had visited Jill's house late at night for a "booty call," when L.P. was present. He also described an instance at Hooter's in which he met Jill for lunch, and she consumed more than one alcoholic beverage then left to pick up L.P.

Phillip testified that he is employed as a family-practice physician in Wadley and Hope and as an emergency room physician in Magnolia. According to Phillip, his family practice clinic hours are from 8:30 a.m. to 3:30 p.m., and he works as an emergency room physician on nights and weekends. He lives with his wife, her two children from a previous marriage, and L.P. Phillip described L.P. as "a great young girl . . . smart . . .intelligent . . . ahead of her peers as far as her education." The only negative behavior he was aware of was "anger issues every once in a while with her brothers."

Phillip asserted that after L.P. had been with her mother, she goes to bed right after school. He also observed her picking up sticks and mimicking smoking. He described an adjustment period for L.P. when she came from her mother's care. According to Phillip, he intended to keep L.P. at Trinity after the prekindergarten program. He claimed he always provided the supplies she required for school. He contrasted the items that he had volunteered to provide for a Thanksgiving party at school with those that Jill had volunteered. He provided "little cocktail weenie things with the bread around them." Jill provided sandwiches "that were whole and had to be cut."

Phillip recalled two instances where L.P. was injured while in Jill's care. The first was a burn

6

that was suffered at Jill's mother's house. The second was a "vaginal tear," purportedly discovered by faculty at Trinity.

Phillip asserted that his brief reconciliation with Jill was merely a ploy to spend more time with L.P. He admitted that around that time he was also casually dating Lacy and had a relationship with a woman named Natalia, who was an overnight guest in his home. Phillip provided several pictures of his home, including a picture of L.P.'s bedroom. However, he admitted that when he first married Lacy, L.P. shared a bedroom with one of Lacy's sons.

Phillip concluded his case-in-chief by calling his mother, Sharon Pace. She testified that she has regular visits with L.P. every Tuesday night that she is in Phillip's care. She stated that she anticipated having L.P. every Tuesday if Phillip got full custody. Sharon testified that on one occasion, when Jill picked up L.P. at her residence, she thought Jill smelled of alcohol.

In Jill's case, she first presented the testimony of Linda Lowe, a fellow teacher and friend. Lowe testified that she saw Jill nearly every day during the school year and never questioned Jill's sobriety or observed her behaving unprofessionally.

Jill next called Erica Young, an investigator for Texas Family Protective Services. She testified that she investigated a complaint of child abuse and neglect filed against Jill and her then boyfriend Lancaster. In the course of the investigation, L.P. was subjected to a forensic medical examination, which revealed a "straddle injury" and a urinary tract infection. Jill and Lancaster were cleared of all charges. When Investigator Young called Phillip to discuss closing the investigation, he objected. Phillip's wife was also on the line and began to yell and curse at Investigator Young.

Jill then called Lindsey Franklin. Franklin stated that she was a veteran school teacher with eleven years' service in the Texarkana School District. She also stated that she has known Jill for

twenty-five years, and she is also a mother of two. Franklin opined that Jill was trustworthy, and she never observed Jill in an intoxicated state. She disputed the accusations made by Munn. Franklin stated that, as a schoolteacher, she is a mandatory reporter and would have been obligated to report Jill's behavior.

Jennifer Jean Brown, the woman who shared Jill's residence, testified next. She stated that she splits rent and utilities with Jill. Based on her observations, Brown opined that Jill is "a wonderful mom." She described Jill's interaction with L.P. as "very loving, very hands on," noting that mother and daughter "do a lot of fun things together." Brown stated that Lancaster was the only one of Jill's male friends that she had met.

Marsha Hardin, Jill's mother, testified that she was cooking eggs with L.P. the day L.P. burned her hand. L.P. was standing on a chair and fell when she reached around her to take the eggs off the burner. Hardin said that she gave L.P. first aid and wrapped her hand. L.P. had a school performance that night, so she gave her a "mitten" to protect the minor injury. According to Hardin, Jill notified Phillip, and Phillip never spoke to her about the incident.

Jill again testified to conclude her case-in-chief. She stated that no one from Trinity told her that L.P.'s lunch was inadequate. Jill asserted that she had made a sandwich but had forgotten to send it. According to Jill, she currently has no communication with Phillip but instead communicates through Phillip's new wife, Lacy. When L.P. is exchanged, Jill takes the child to Phillip's door but prefers to have L.P. dropped off at the curb when she gets custody.

After taking the case under advisement, the circuit court found a material change of circumstances, but nonetheless concluded that the best interest of the child required it to maintain the status quo. The circuit court continued the split-custody arrangement, the current level of agreed

8

child support, and L.P.'s continued attendance at Trinity. In its July 17, 2018 written order, the circuit court found that "it was established by a preponderance of the evidence that [Jill] used cocaine on one occasion since the last Order," however, "[t]he Court does not find that such evidence warrants a change in the custody order previously entered in this cause." The circuit court also found that Jill "has met the child's educational needs and most of the other evidence presented was personal in nature and would not have been known by the child or impacted the mother-daughter relationship." Further, "[t]here was no evidence presented that [Jill's] current renters have harmed or would harm the child." The circuit court also denied Jill's attorney-fee petition. Phillip timely appealed the custody decision, and Jill cross-appealed the denial of attorney's fees.

In domestic-relations cases, our review is de novo, but we will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Dare v. Frost*, 2018 Ark. 83, 540 S.W.3d 281. We also defer to the circuit court on matters of the credibility of witnesses. In matters involving child custody, the best interest of the child is the paramount consideration. *Id.*

On appeal, Phillip first argues that the joint-custody arrangement that the parties agreed to in their divorce decree should be set aside. Citing a plethora of cases from our court of appeals, he asserts that divorced parents must be able to cooperate in reaching shared decisions in matters affecting the children's welfare in order to maintain a joint-custody arrangement. Further, when those parents fall into such discord that they are unable to cooperate in sharing the physical care of the children, a material change in circumstances occurs and joint custody must then be set aside. Phillip contends that such a situation exists in this case because both parents testified that they simply could not cooperate and communicate about L.P. at all and that L.P.'s needs were not being

9

met because of the lack of communication. This argument does not persuade.

We note first that in 2013, the General Assembly amended Arkansas Code Annotated section 9-13-101 to announce that an award of joint custody is "favored" in Arkansas. 2019 Ark. Acts 906. Previously, case law held that joint custody was not favored unless circumstances clearly warrant such action. *See, e.g., Gray v.* Gray, 96 Ark. App. 155, 239 S.W.3d 26. This change in the law is profound; the parties were no longer obligated to maintain a careful balance of cooperation to stave off a judicial dissolution of a joint-custody arrangement. This change in law spawned the approach manifested in *Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297, where our court of appeals affirmed a circuit court's decision to lessen conflict by modifying the more contentious provisions in a custody decree without scrapping the basic joint-custody arrangement. Such was the approach in the case before us.

By all accounts, L.P. is a happy, healthy, intelligent child. We find nothing in the record that demonstrates that parental discord has affected L.P.'s health and welfare. We are mindful that there is conflict between Lacy and Jill, but aside from Jill's decision to bar Lacy from her property during custody exchanges, there is no discernable effect on L.P. Nonetheless, Jill testified that she regularly communicates with Lacy regarding L.P. This fact is certainly understandable inasmuch as Lacey, and not Phillip, regularly picks up L.P. at Trinity and is apparently more directly involved in the day-to-day care of L.P. when L.P. is in Phillip's custody. We are mindful that there was some potential disagreement between Jill and Phillip regarding L.P.'s continued attendance at Trinity; as in *Hoover*, the decree resolves this issue. Accordingly, we find no clear error in the circuit court's decision to maintain the joint-custody arrangement. Having determined that the circuit court did not clearly err in continuing the joint-custody arrangement, we need not consider the balance of

Phillip's argument in which he contends he would be the better choice for primary custodian.

## II. *Cross-Appeal.*

Jill asserts that the circuit court abused its discretion in not awarding her attorney's fees. She asserts that Arkansas Code Annotated section 9-12-309(a) (Repl. 2015) has been construed to allow such an award of fees in actions for custody modification. Jill notes the disparity in her income as compared to Phillip, who is a physician. She analogizes her situation to that in *Hydrick v. Hydrick*, 224 Ark. 712, 275 S.W.2d 878 (1955), in which the *Hydrick* court stated that if mother "is compelled to use her meager earnings, it will be with money she would otherwise probably use for the benefit of the [child]." Jill notes that Phillip has repeatedly returned to court even though the original decree was only entered in 2014.

We review a circuit court's decision regarding an award of attorney's fees in a domestic-relations case for an abuse of discretion. *Foster v. Foster*, 2016 Ark. 456, 506 S.W.3d 808. We hold that under the facts and circumstances of this case, the circuit court did not abuse its discretion by denying Jill's petition for attorney's fees.

Affirmed on direct appeal and on cross-appeal; court of appeals' opinion vacated.

WOOD and WOMACK, JJ., concur.

**SHAWN A. WOMACK, Justice, concurring.** I am pleased to join the majority's opinion, but I write separately to explain why we should explicitly overturn the court of appeals' erroneous standard for modifying joint custody orders. The court of appeals' low threshold for modification disregards the express legislative policy favoring joint custody, the appellate standard of review for custody decisions, and the "child's best interest" analysis. We should reject that approach here.

Since 2013, joint custody has been the favored arrangement in Arkansas. *See* Ark. Code Ann.

§ 9-13-101(a)(1)(A)(iii) (Repl. 2015). This was a distinct departure from prior case law holding that joint custody was disfavored unless circumstances warranted divided custody. *See Hansen v. Hansen*, 11 Ark. App. 104, 106, 666 S.W.2d 726, 727 (1984). Despite this significant change, the court of appeals has continued to apply their pre-2013 standard for modifying joint custody. *See Stibich v. Stibich*, 2016 Ark. App. 251, at 5, 491 S.W.3d 475, 478–79. In *Stibich*, the court stated: "Regardless of whether joint custody is favored, our law remains that 'the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award of joint custody, and such an award is reversible error when cooperation between the parents is lacking.'" *Id.* (quoting *Gray v. Gray*, 96 Ark. App. 155, 239 S.W.3d 26 (2006)). In other words, the court of appeals brushed aside the statutory preference for joint custody in favor of their previous approach without giving any consideration to the legislative policy change.

It is evident that the General Assembly contemplated uncooperative parents when it changed the preference to joint custody. As part of Act 1156 of 2013, the custody statute provides that if "one parent demonstrates a pattern of willfully creating conflict to disrupt current joint custody, the court may deem such behavior as a material change of circumstances and may grant primary custody to the nondisruptive parent." Ark. Code Ann. § 9-13-101(b)(1)(A). The statute creates a requisite intent: "willfully creating conflict to disrupt current joint custody." *Id.* Though other considerations may warrant modifying joint custody, such as the child's best interest, the statute clearly contemplates more than a mere "inability to cooperate and communicate." *See Hewett v. Hewett*, 2018 Ark. App. 235, at 6, 547 S.W.3d 138, 141 (reversal of joint custody warranted based on parties' inability to cooperate and communicate). And rightfully so. People typically do not

divorce or engage in custody battles because they are skilled at cooperation and communication.

The court of appeals' approach disregards the custody modification statute and the "best interest" considerations. It instead holds that parties' inability to cooperate can be the sole and dispositive factor in reversing joint custody. *See Stibich*, 2016 Ark. App. 251, at 6, 491 S.W.3d at 479 ("It is contrary to the best interest of the children to award joint custody to parents who cannot cooperate–particularly when cooperation is lacking on matters pertaining to the care and upbringing of the children."). In *Li v. Ding*, 2017 Ark. App. 244, 519 S.W.3d 738, the court held the parents' inability to communicate, on its own, precluded a finding that joint custody was in the children's best interest and reversed the joint custody order. To reach this conclusion, the court of appeals disregarded the deference given to the circuit court's superior position in evaluating the best interest of the children. *See McNutt v. Yates*, 2013 Ark. 427, at 8–9, 530 S.W.3d 91, 97. Indeed, the court of appeals gave no consideration to the "best interest" factors. This is especially problematic given that the primary consideration in child custody cases is the welfare and best interest of the children; all other considerations are secondary. *See, e.g., Taylor v. Taylor*, 345 Ark. 300, 304, 47 S.W.3d 222, 224 (2001). Moreover, the "best interest" analysis includes consideration of several factors, such as the psychological relationship between the parent and child, the need for stability and continuity in the child's relationship with parents and siblings, the past conduct of the parents toward the child, and the child's preference. *See, e.g., Baber v. Baber*, 2011 Ark. 40, at 10–11, 378 S.W.3d 699, 705. Notably, the parents' ability to communicate is absent from this list.

The majority recognizes that the "profound" statutory change favoring joint custody meant that parties are no longer obligated to maintain a careful balance of cooperation to stave off judicial dissolution of joint custody. I wholeheartedly agree. But we should go one step further and explicitly

reverse the court of appeals' erroneous joint custody modification approach. Accordingly, I concur in the majority's decision.

*Smith Weber, L.L.P.*, by: *C. David Glass*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellant.

*Appellate Solutions, PLLC*, d/b/a *Riordan Law Firm*, by: *Deborah Truby Riordan*, for appellee.